**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MARY R. JOHNSON,

     *Plaintiff,*

                                 CASE NO. 3:16-cv-00178-J-MCR

v.

SPECIALIZED LOAN SERVICING, LLC,

     *Defendant.*

_____/

## DEFENDANT SPECIALIZED LOAN SERVICING, LLC'S TRIAL BRIEF

Defendant, SPECIALIZED LOAN SERVICING, LLC ("Defendant" or "SLS"), by and through its undersigned counsel, and pursuant to Local Rule 3.06(c) and this Court's January 11, 2018 Pretrial Order [D.E. 84], hereby files its Trial Brief and in support thereof states as follows:

### INTRODUCTION

MARY JOHNSON (the "Plaintiff") and her counsel brought suit against SLS for numerous consumer protection claims that all stem from loss mitigation efforts in 2015. Specifically, Plaintiff successfully completed a trial payment plan and was offered a permanent loan modification by SLS. Plaintiff and her counsel did not follow the instructions provided by SLS and failed to submit two signed, wet-ink originals of the permanent loan modification documents. This led to Plaintiff's counsel engaging in an unsuccessful letter-writing campaign designed to manufacture a technical violation of the Real Estate Settlement Procedures Act, 12 U.S.C. § 2601, *et seq.* ("RESPA").

Plaintiff's claims fail because she did not enter into a binding permanent loan modification with SLS in 2015. Her counsel's failure to follow the instructions provided by SLS

1

resulted in the same being rescinded. When Plaintiff's counsel sent its first correspondence to SLS related to the unsuccessful loan modification, SLS responded by informing Plaintiff that SLS never received the properly executed modification documents from Plaintiff and provided Plaintiff and her counsel with a copy of what SLS received. Notably, the documents SLS provided include only ***one copy*** of the modification offer – not ***two*** originals as required. When Plaintiff's counsel proceeded to send numerous correspondence to SLS that were duplicative and related solely to loss mitigation, SLS continued to maintain that it did not receive the signed modification documents as required. Nevertheless, even after filing this lawsuit, SLS worked diligently with Plaintiff to get her performing under a modified loan. These efforts culminated in March 2017, when Plaintiff executed and returned two signed, wet-ink original permanent loan modification contracts that were accepted by SLS. As a result, SLS vacated the final judgment of foreclosure against Plaintiff.

As such, there is not an active dispute between Plaintiff and SLS. Plaintiff is currently performing under a modified loan and SLS continues to act as her loan servicer. The dispute that is set for trial on February 5, 2018 is being driven by Plaintiff's counsel, as their quest for attorney's fees under the one-way fee provisions in many consumer protection statutes has necessitated a trial. This is further highlighted by the fact that a judgment for SLS in this case will not prejudice Plaintiff – she has already received her loan modification and is paying under the same. As will be discussed more thoroughly below, SLS did not violate any applicable law with respect to the servicing of Plaintiff's loan and this Court should rule in favor of SLS at the upcoming trial.

1325174.1

## STATEMENT OF THE CASE AND FACTS

SLS began servicing Plaintiff's loan in December 2011. Plaintiff defaulted on her loan payments and a foreclosure was initiated against her in July 2012. On March 2, 2015, a Final Judgment of foreclosure was entered against Plaintiff. Subsequent to the Final Judgment being entered against her, in April 2015, Plaintiff submitted a loss mitigation application to SLS. Plaintiff was assisted in submitting her loss mitigation application by Karen Weaver (Ms. Weaver"), a loan counselor at Jacksonville Area Legal Aid, Inc. ("JALA"). In conversations with Ms. Weaver, she expressly stated that she was not an attorney and that JALA was not representing Plaintiff – rather, she was merely a housing counselor trying to help Plaintiff get a loan modification.

SLS processed Plaintiff's loss mitigation application and subsequently sent a trial payment plan modification offer (the "TPP") to Plaintiff in June 2015. Plaintiff successfully completed the TPP by remitting the required payments for the months of July, August, and September. As such, SLS sent Plaintiff a letter on September 22, 2015 enclosing two permanent loan modification contracts (the "2015 Modification Offer"). The 2015 Modification Offer required the two wet-ink original loan modification offers to be returned to SLS by October 31, 2015. SLS repeatedly called Plaintiff between September 22, 2015 and November 5, 2015 regarding the 2015 Modification Offer, none of which were answered or returned by Plaintiff.

On November 6, 2015, Plaintiff called SLS and learned for the first time about the 2015 Modification Offer, as Plaintiff alleges she never received the same. When it became evident that Plaintiff was interested in a permanent modification, SLS re-sent the 2015 Modification Offer to Plaintiff and Ms. Weaver directly. Plaintiff does not recall whether she signed two wet-ink original loan modification contracts and Ms. Weaver was unable to recall whether she returned

two wet-ink originals of the same to SLS in November 2015. SLS's imaging system recorded an in-bound letter from Plaintiff to SLS on November 17, 2015 that contained *one* copy of the loan modification contract that was executed by Plaintiff.

Due to Plaintiff's Counsel's failure to return the two original, wet-ink loan modification contracts as required by the 2015 Modification Offer, SLS sent Plaintiff a denial letter on December 14, 2015 stating that her loan would not be modified. On December 22, 2015, SLS, through counsel, moved to reschedule a previously-ordered foreclosure sale. JALA proceeded to send a letter on January 4, 2016 demanding SLS enforce the 2015 Modification Offer, a letter on January 6, 2016 appealing the denial of Plaintiff's loan modification, and a formal complaint to the Consumer Finance Protection Bureau (the "CFPB Complaint").[1] SLS responded to JALA on January 19, 2016, and enclosed a copy of everything it had received from Plaintiff in November 2015 – including the *one* signed copy of the 2015 Modification Offer. Notwithstanding Plaintiff and Ms. Weaver's error in executing the 2015 Modification Offer, SLS nonetheless agreed to send Ms. Johnson a second permanent loan modification offer in January 2016 (the "January 2016 Modification Offer") and extend the timeframe to execute the same until February 19, 2016.

The Plaintiff never signed and returned the January 2016 permanent loan modification contract. Rather, Plaintiff filed the present suit against SLS on January 11, 2016 in the small claims court for Duval County. The original Complaint contained two counts for alleged violations of RESPA and the FDCPA related to SLS's alleged improper denial of the 2015 Modification Offer and SLS's motion to reschedule the previously-ordered foreclosure sale.

---

[1] Ms. Weaver attached two documents to the CFPB Complaint – *one* signed copy of the 2015 Modification Offer and the green card return receipt for the November 17, 2015 package sent to SLS – as proof of SLS's non-compliance.

[D.E. 2]. The present case was removed from the state court to this Court on February 24, 2016 by SLS. [D.E. 1].

On March 8, 2016, while both the foreclosure action and this case were pending, Plaintiff called SLS in an attempt to make her payment under the January 2016 Modification Offer. During this call, SLS informed Plaintiff that SLS never received final modification documents and could not accept her payment without first having the properly-executed documents. Plaintiff explained that she wanted to sign the January 2016 Modification Offer and stay in her home, but that her attorneys were preventing her from signing the same. After being notified that Plaintiff was represented by counsel, SLS read Plaintiff an attorney script and ceased communicating with her directly.

SLS's refusal to accept Plaintiff's payments resulted in JALA sending two additional letters on May 12 and May 20, 2016, both of which continue to allege that Plaintiff permanently modified her loan in November 2015. SLS responded on June 20, 2016 by stating, among other things, that SLS had previously responded to this exact issue in prior correspondence with JALA and re-attached its January 19, 2016 letter. This once again provided Plaintiff and JALA with exactly what SLS received in November 2015 – i.e. only *one* signed copy of the 2015 Modification Offer.

Plaintiff and JALA subsequently retained outside counsel from South Florida in Mr. Jeffrey Golant. Mr. Golant then continued the letter-writing campaign against SLS by sending yet another letter on November 28, 2016 claiming Plaintiff's Loan was permanently modified in November 2015. SLS responded to this letter on December 15, 2016 by noting that Plaintiff's Counsel's correspondence was related to loss mitigation and provided information about efforts

made to modify Plaintiff's loan. The only other correspondence alleged by Plaintiff in the Complaint is a letter from Plaintiff's Counsel to SLS on January 16, 2017.[2]

Notwithstanding all of the duplicative and harassing correspondence, SLS continued to work with Plaintiff to get her performing under a loan modification. Plaintiff made three additional TPP payments in December 2016, January 2017, and February 2017, resulting in SLS sending Plaintiff a final permanent modification offer in March 2017 (the "March 2017 Modification Offer"). The March 2017 Modification Offer waived all fees and costs that were in dispute and expressly superseded all prior modifications. Plaintiff executed *two* wet-ink originals and returned them to SLS as required and the same became effective March 1, 2017. Plaintiff is current and performing under this modification and SLS remains her loan servicer.

On April 12, 2017, Plaintiff's Counsel filed a Second Amended Complaint, the operative pleading for this case. [D.E. 47]. The Second Amended Complaint contains the following five counts:

1.  RESPA (Loss Mitigation);

2.  Fair Debt Collection Practices Act (the "FDCPA");

3.  RESPA (Error Resolution);

4.  Negligence; and

5.  Florida Consumer Collection Practices Act (the "FCCPA").

The parties submitted a Joint Pretrial Statement on January 3, 2018 which contained several stipulated facts and attempted to narrow the issues before the Court. [D.E. 79]. This case is now ripe for trial on February 5, 2018.

---

[2]In the Second Amended Complaint, Plaintiff specifically notes that "[t]o date, the undersigned has not received any response." This statement is not supported by the facts in this case, as SLS sent Plaintiff a response on February 9, 2017, two months prior to the filing of the Second Amended Complaint on April 12, 2017. That said, Plaintiff does not allege any causes of action premised on SLS's response to the January 16, 2017 correspondence and therefore the same cannot be raised at trial.

**ARGUMENT**

In preparing the Pretrial Statement, SLS provided this Court with a thorough and complete list of the critical issues of law to be decided at trial.[3] [D.E. 79 at 20-24]. Those issues of law can be easily distilled into the following three categories: (I) Whether Plaintiff and SLS entered into a valid, binding loan modification in November 2015; (II) Whether Plaintiff suffered any injury in fact that would confer Article III standing; and (III) Whether Plaintiff's individual causes of action against SLS are valid.[4] If Plaintiff failed to enter into a valid, binding loan modification in November 2015 or if she has failed to suffer an injury in fact, the same is dispositive as to all causes of action brought by Plaintiff. As will be discussed more thoroughly below, this Court should enter judgment in favor of SLS.

## I.  Plaintiff Failed to Modify Her Loan in 2015

The overriding issue that SLS has identified throughout the Pretrial Statement is whether Plaintiff and SLS entered into a valid, binding loan modification in November 2015. [*See, e.g.,* D.E. 79 at 21 ¶ 1]. This issue is controlling over Plaintiff's entire case. The evidence to be presented at trial will unquestionably show that there was never a valid, binding loan modification because Plaintiff failed to properly execute and return two wet-ink originals of the 2015 Modification Offer and SLS never signed the same. Plaintiff appears to recognize the fact that she failed to properly comply with the 2015 Modification Offer because her counsel, for the

---

[3] SLS notes that Plaintiff's proposed issues of law to be decided are incomplete, vague, at times unrelated to the actual elements of Plaintiff's causes of action, and unlikely to be helpful to the Court in presiding over this case. SLS sought to work with Plaintiff's Counsel in preparing issues of law to be decided by this Court, but Plaintiff's Counsel insisted on separate statements. As such, Plaintiff should be limited at trial to arguing only the issues framed by her counsel in the Pretrial Statement, as only the issues in the Pretrial Statement control what is to be before this Court. S*ee* Local Rule 3.06(e) ("[t]he pretrial statement and the pretrial order, if any, will control the course of the trial and may not be amended except by order of the Court in the furtherance of justice.").

[4] SLS also notes that it has raised an issue of law to be decided related to conditions precedent. Specifically, SLS maintains that Plaintiff was required under paragraph 20 of her mortgage contract to provide SLS with notice and an opportunity to cure any alleged error prior to filing this case in January 2016. SLS recognizes this Court's decisions to the contrary in its Orders with respect to SLS's prior motions to dismiss, but does not waive this issue for purposes of appeal.

first time in this two-year-old litigation, argued in the January 3, 2018 Pretrial Statement that compliance with the 2015 Modification Offer's instructions is not required. [*See* D.E. 79 at 5]. As will be discussed more thoroughly below, (A) Plaintiff did not properly execute and return two wet-ink originals of the 2015 Modification Offer; (B) SLS never signed the 2015 Modification Offer and therefore Florida's Banking Statute of Frauds renders the same unenforceable; and (C) Plaintiff's new argument, to the extent this Court allows it, is unsubstantiated by case law or the facts of this case.

### A.    *Plaintiff did not properly execute and return two wet-ink originals of the 2015 Modification Offer.*

It is undisputed that the 2015 Modification Offer required Plaintiff to submit two signed originals in order to permanently modify her loan. The 2015 Modification Offer also contained signature and notary lines for SLS to execute the 2015 Modification Offer, meaning SLS's signature was also required to permanently modify the loan. This factual scenario is nearly identical to a case also involving Plaintiff's Counsel[5] and decided by The Honorable Marcia Morales Howard in *Finster v. U.S. Bank National Association*, 245 F. Supp. 3d 1304, 1321-22 (M.D. Fla. 2017), *appeal docketed*, No. 17-11662 (11th Cir. Apr. 12, 2017). In *Finster*, the defendant required the plaintiff to sign an return two original loan modification contracts that contained signature and notary lines for the defendant to sign. *Id.* at 1308-14. Rather than follow the instructions, the plaintiff copied the originals and executed said copies without first removing various stickers and markers that were affixed to the originals. *Id.* As a result, the defendant denied plaintiff a loan modification. *Id.*

Similar to the present case, Mr. Golant then began a letter-writing campaign alleging that the defendant violated RESPA by pursuing a foreclosure action and demanding that the

---

[5] Specifically, attorney Jeffrey Golant also represented the plaintiff, Blue Finster.

defendant recognize the validity of the prior modification. *Id.* Mr. Golant sent approximately four letters to the defendant all related to the prior modification. *Id.* Despite receiving responses to all letters sent by Mr. Golant, the plaintiff nevertheless proceeded to file suit against the defendant. *Id.* Specifically, the plaintiff claimed the defendant failed to conduct a reasonable investigation as required under RESPA and sought to collect an illegitimate debt under the FCCPA. *Id.* at 1316, 1318.

The defendant moved for summary judgment against the plaintiff, which was granted by Judge Howard. *Id.* at 1321-22. In doing so, Judge Howard expressly concluded that "it is undisputed that Finster did not actually comply with [her] obligations [under the loan modification offer] in that she did not return the signed <u>original</u> agreements as [the defendant] required…." *Id.* at 1320. As such, Judge Howard found that the defendant could not have had the requisite knowledge under the FCCPA to violate the same. *Id.* at 1321-22. Additionally, Judge Howard rejected Mr. Golant's "theory… that a reasonable investigation would have uncovered [the alleged error] and therefore, because [the defendant] found no error, it could not have performed a reasonable investigation." Judge Howard concluded that the plaintiff's RESPA claim was "premised entirely on [the plaintiff's] disagreement with [the defendant's] determination that no error occurred" and that the same does not state a cause of action. *Id.* at 1316 (citing *Whittaker v. Wells Fargo Bank, N.A.*, No. 6:12-cv-98-Orl-28GJK, 2014 WL 5426497, at *8 (M.D. Fla. Oct. 23, 2014)).[6]

Just as in *Finster*, the Plaintiff failed to comply with the 2015 Modification Offer by failing to return two wet-ink originals. Ms. Weaver, the JALA employee who assisted Plaintiff with her loan modification and who sent in the documents to SLS, could not recall whether she

---

[6] Moreover, Judge Howard cautioned Mr. Golant on three separate occasions in her written opinion for presenting disingenuous arguments, failing to maintain condor with the court, and changing his position as to the defendant's liability. *See id.* at 1309 n.6; 1311 n.7; and 1319 n.17.

1325174.1

sent two wet-ink originals to SLS in November 2015 during her deposition in March 2017. In her CFPB Complaint, Ms. Weaver only attached a single copy of the 2015 Modification Offer as proof of SLS's non-compliance. In Plaintiff's deposition, she could not remember signing any copies of the 2015 Modification Offer, much less two originals, and could not recall how many copies of the 2015 Modification Offer Ms. Weaver sent to SLS. SLS's business records, on the other hand, contain exactly what Plaintiff sent in on November 17, 2015 – *one copy* of the 2015 Modification Offer executed by Plaintiff. The Plaintiff failed to comply with the explicit terms of the 2015 Modification Offer and therefore a valid, enforceable loan modification was not effected.

> **B.** ***Florida's Banking Statute of Frauds defeats Plaintiff's contention that the 2015 Modification Offer is a valid, binding loan modification.***

In addition to Plaintiff failing to comply with the terms of the 2015 Modification Offer, Plaintiff's claim that a valid, binding loan modification was entered into between Plaintiff and SLS in November 2015 is defeated by Florida's Banking Statute of Frauds. § 687.0304(2), Florida Statutes. This argument was also raised by the defendant in *Finster*. 245 F. Supp. 3d at 1320. The court in *Finster* never ruled on the defendant's banking statute of frauds argument, citing that the FCCPA claim failed on other grounds. *Id.* That said, in the present case there is an unavoidable Banking Statute of Frauds problem that is dispositive of Plaintiff's claims against SLS.

The plain language of Florida's Banking Statute of Frauds reads: "[a] debtor may not maintain an action on a credit agreement unless the agreement is in writing, expresses consideration, sets forth the relevant terms and conditions, ***and is signed by the creditor*** and the debtor." (***emphasis added***). The term "credit agreement" is broadly defined as any "agreement to lend or forbear repayment of money…, to otherwise extend credit, or to make any other financial

10

accommodation." Fla. Stat. § 687.0304(1)(a). A "creditor" is "a person who extends credit under a credit agreement with a debtor." Fla. Stat. § 687.0304(1)(b).

When analyzing a statute, the "first rule in statutory construction is to determine whether the language at issue has a plain and unambiguous meaning with regard to the particular dispute." *U.S. v. Segarra*, 582 F.3d 1269, 1271 (11th Cir. 2009) (citing *U.S. v. Fisher*, 286 F.3d 1329, 1337-38 (11th Cir. 2012)). "If the statute's meaning is plain and unambiguous, there is no need for further inquiry." *Id.* Additionally, when looking to the plain language, this Court must look to the entire statutory context. *See Segarra*, 582 F.3d at 1271 (citing *U.S. v. Silva*, 443 F.3d 795, 798 (11th Cir. 2006)).

Courts that have interpreted Florida's Banking Statute of Frauds have routinely refused to allow a plaintiff to sue on a loan modification that is not signed by the creditor in cases similar to the present case. In *Dixon v. Countrywide Financial Corp.*, the Southern District of Florida noted that § 687.0304 was designed to "protect lenders from liability for action or statements a lender might make in the context of counseling or negotiating with the borrower which the borrower construes as an agreement, the subsequent violation of which is actionable against the lender." 664 F. Supp. 2d 1304, 1309 (S.D. Fla. 2009). In other words, the entire purpose of § 687.0304 was to not punish lenders and servicers that were working with borrowers to save their homes by disallowing the enforcement of credit agreements that were never reduced to writing or were **unsigned** by said lender. *See Id.*

In *Bloch v. Wells Fargo Home Mtg.*, the Eleventh Circuit was confronted with an oral agreement to modify a loan that was not reduced to writing or signed by the creditor. 755 F.3d 886, 890 (11th Cir. 2014). The borrowers brought suit against their servicer for promissory estoppel, which was grounded in alleged oral promises and unsigned letters from the servicer to

the borrowers. *Id.* at 889-90. The Eleventh Circuit affirmed the district court's order in favor of the servicer, stating "[i]t is undisputed there is no **signed** written agreement expressing consideration and setting forth the relevant terms and conditions of the purported HAMP modification." *Id.* at 890. *See also Brake v. Wells Fargo*, Case No. 8:10-cv-338, 2011 WL 6719215, at *1-2 (M.D. Fla. Dec. 29, 2015) (finding a loan modification to be a "financial accommodation" under § 687.0304 and thus requiring the same to be in writing and signed by the creditor); *Vargas v. Deutsche Bank Nat. Trust Co.*, 104 So. 3d 1156, 1168 (Fla. 3d DCA 2012) ("[b]ecause the alleged January 29th agreement is **not signed** by Deutsche Bank or Ocwen [(the servicer)], it cannot be enforced.") (emphasis added); *Fenn v. Litton Loan Servicing LP*, Case No. 6:10-cv-965-Orl-28DAB, 2010 WL 8318866, at *2 (M.D. Fla. Dec. 10, 2010).[7]

Moreover, the Fifth Circuit Court of Appeals, in analyzing a similar set of facts, concluded that the lack of a servicer's signature on a loan modification agreement was dispositive with respect to Texas' banking statute of frauds.[8] In *Law v. Ocwen Loan Servicing, LLC*, the servicer received executed loan modification documents that were signed by the borrower (albeit late). 587 Fed. Appx. 790, 794 (5th Cir. 2014). The servicer never signed the loan modification. *Id.* After the borrower brought suit for breach of contract, the servicer moved to dismiss claims against it because, among other things, the claims were barred by Texas' banking statute of frauds. *Id.* at 792. The trial court agreed and dismissed the claims, prompting

---

[7] Additionally, the Minnesota banking statute of frauds, Minn. Stat. § 513.33, was the model on which Florida based § 687.0304, making decisions interpreting Minnesota's banking statute of frauds particularly instructive. *See Brenowitz v. Central Nat. Bank*, 597 So. 2d 340, 342 (Fla. 2d DCA 1992). Minnesota courts, both state and federal, have likewise refused to allow plaintiffs to sue on an unsigned loan modification. *See Rogers v. Bank of America, N.A.*, Case No. 13-cv-1698, 2014 WL 2968900, at *7 (D.Minn. Jul. 1, 2014) (stating "allegations of an oral loan modification agreement, **or an unexecuted written loan modification agreement**, are not sufficient to form the basis of a breach of contract claim." (**emphasis added**) (citing Myrlie v. Countrywide Bank, 775 F. Supp. 2d 1100, 1109 (D.Minn. 2011)). *Kelly v. Wells Fargo Bank, N.A.*, Civ. No. 14-3133, 2016 WL 1642624, at *7 (D.Minn. Apr. 24, 2016) ("Finally, the Court notes that the credit statute of frauds is not met because the [document] was **not signed** by the creditor and the debtor.") (internal quotations omitted) (**emphasis added**).

[8] Like Florida's § 687.0304, Texas' banking statute of frauds requires that a loan modification be signed by the creditor. *See* Tex. Bus. & Com. Code § 26.01(a).

the borrower to appeal. The Fifth Circuit, in analyzing the banking statute of frauds defense, noted that the servicer did not sign the loan modification and found this to be determinative. *Id.*

Similarly, in *Owens v. Specialized Loan Servicing, LLC*, the Fifth Circuit Court of Appeals found that a modification offer made by SLS similar to the one at issue in this case was subject to the relevant statute of frauds. 694 Fed. Appx. 950, 954-55 (5th Cir. 2017). In *Owens*, the borrowers completed a trial payment plan and were offered a permanent loan modification. *Id.* at 952. There was a dispute as to whether the borrowers electronically executed the permanent loan modification, but it was uncontested that SLS did not sign the same. *Id.* Ultimately, the Fifth Circuit found that Texas' banking statute of frauds applied to the borrower's breach of contract claims and ultimately affirmed the lower court's order granting summary judgment in favor of SLS. *Id.* at 955. The Fifth Circuit considered the presence of a signature block for SLS to execute the permanent loan modification as significant, as to find that SLS's signature was not required to make the permanent loan modification enforceable would be to render that portion of the contract meaningless. *Id.* at 954.

In the present case, SLS never executed or notarized the same, meaning the 2015 Modification Offer cannot be used to maintain a cause of action against SLS. The plain language of Florida's Banking Statute of Frauds could not be clearer – in order for a plaintiff to maintain an action against **anyone** that is premised on a credit agreement – i.e. a loan modification – said credit agreement must be in writing and must be **signed** by the creditor. *See* § 687.0304, Florida Statutes. As all copies of the 2015 Modification Agreement will show, SLS never executed the same because Plaintiff failed to return two signed, wet-ink originals. As such, all of Plaintiff's claims that are premised on the 2015 Modification Offer being a valid, binding loan modification

13

fail as a matter of law. *See, e.g., Brake*, 2011 WL 6719215, at \*1-2; *Rogers*, 2014 WL 2968900, at \*7; *Law*, 587 Fed. Appx. at 794.

   **C.    *Plaintiff's new argument that Plaintiff was not obligated to comply with the requirements of the 2015 Modification Offer to have a valid, binding loan modification is false.***

   In apparent recognition that Plaintiff did not properly execute and return two wet-ink originals of the 2015 Modification Offer, Plaintiff has advanced the argument for the first time in the January 3, 2018 Pretrial Statement that her failure to comply with the 2015 Modification Offer's explicit instructions is irrelevant. [D.E. 79 at 5]. This is despite Plaintiff's repeated claims in all correspondence to SLS that she ***did*** follow the instructions and returned everything as required. As an initial matter, for Plaintiff to take the position that she did ***not*** follow the instructions laid out in the 2015 Modification Offer is disingenuous in that Plaintiff has expressly denied such a position for the better part of two years of litigation. This Court should not condone such tactics and Plaintiff should be estopped from arguing contrary to her position that she complied with the terms of the 2015 Modification Offer.

   Notwithstanding Plaintiff's attempt to change positions on the eve of trial, the two cases relied on by Plaintiff are entirely distinguishable from the present case. In *Nowlin v. Nationstar Mortg., LLC*, the permanent modification offer required the plaintiff to sign and return two documents in order to accept the same. 193 So. 3d 1043, 1044-45 (Fla. 2d DCA 2016). However, unlike the present case, the *Nowlin* plaintiffs ***signed, notarized, and sent back*** the documents as required. *Id.* at 1045. Additionally, the defendant in *Nowlin* accepted payments under the alleged loan modification and remained silent as to the validity of the loan modification. *Id.* at 1046. Contrasting those facts to the present case, SLS expressly told Plaintiff on December 14, 2015 that the loan modification was denied and confirmed that fact in correspondence sent on January

19, 2016. SLS also refused to continue taking payments from Plaintiff when she failed to sign and return the January 2016 Modification Offer, as evidenced by the call placed by Plaintiff to SLS directly on March 8, 2016.

Secondly, Plaintiff relies on *Kuehlman v. Bank of America*, 177 So.3d 1282 (Fla. 5th DCA). Like *Nowlin*, the court in *Kuehlman* found that the borrower returned all of the required documents, though the same were untimely. *Id.* at 1283. The key distinction between *Kuehlman* and the present case is the servicer accepted nine mortgage payments under the modification without voicing any objection to the same or ever indicating that a modification was not in place. *Id.* This is entirely distinguishable from the present case, where SLS told Plaintiff that she did not have a modification all the way back on December 14, 2015 and maintained that position until Plaintiff properly executed her modification documents in March 2017. As such, to the extent this Court entertains Plaintiff's argument that her insufficient documents constituted acceptance of the 2015 Modification Offer, despite not complying with the requirements of the same, this argument is not supported by case law.

## II.  Plaintiff Lacks Article III Standing

In order for a plaintiff to have Article III standing, said plaintiff must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Friends of the Earth, Inc. v. Laidlaw Environmental Serv. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)). Standing must be present at the inception of a case in order for a plaintiff to be able to bring a lawsuit. *See Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003) ("Article III standing, like other bases for jurisdiction, generally must be present at the

inception of the lawsuit."); *Lujan*, 204 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit.").

"To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical'" *Spokeo*, 136 S. Ct. at 1548 (citing *Lujan*, 540 U.S. at 560). For an injury to be concrete, it must be more than "a bare procedural violation, divorced from any concrete harm…." *Id.* at 1549. In *Spokeo*, the plaintiff sought to recover under a consumer protection statute based on a procedural violation – i.e. disseminating incorrect information – but could not point to any damage or harm that the plaintiff suffered as a result of the incorrect information. *Id.* at 1544-45. The Supreme Court found in favor of the defendant, holding that a mere procedural violation of the Fair Credit Reporting Act was insufficient to confer Article III standing on the plaintiff. *Id.* at 1550.

Plaintiff cannot meet her burden in establishing standing in this case. The original Complaint was filed January 11, 2016.[9] [D.E. 1]. At the time the Complaint was filed, Plaintiff had not suffered any concrete injury that would give rise to Article III standing. Importantly, all of Plaintiff's initial grievances were premised on the 2015 Modification Offer being a valid, binding modification. As addressed in section I, *supra*, the 2015 Modification Offer was not properly executed and returned by Plaintiff and SLS never signed the same, meaning it was not valid and cannot form the basis of Plaintiff's harm. Additionally, Plaintiff was still in her home and was actively working with SLS to modify her loan, as evidenced by the appeal of SLS's decision regarding the 2015 Modification Offer. Plaintiff's home was never sold through a foreclosure sale because SLS continuously cancelled and reset the foreclosure sale while

---

[9] The original Complaint was ultimately removed by SLS on February 24, 2016. [D.E. 1].

1325174.1

engaged in loss mitigation with Plaintiff.[10] Plaintiff also ultimately modified her loan in March 2017, which waived any alleged fees or costs added to her loan.

Moreover, Plaintiff equally fails to allege any concrete harm in the Second Amended Complaint. The damages alleged by Plaintiff in the Second Amended Complaint includes alleged default-related fees that SLS charged Plaintiff after the November 2015 modification efforts, emotional distress and a deprivation of rights related to losing her home, and punitive and statutory damages available under the various consumer protection statutes her claims are brought under. As discussed in footnote 9, SLS cannot be the cause of any harm related to Plaintiff's foreclosure action, as that harm was directly caused by Plaintiff's own failure to make her monthly mortgage payments. *Coursen*, 588 Fed. Appx. at 886. As addressed in section I, *supra*, all fees that were allegedly charged to Plaintiff were legitimate because she did not have a valid, enforceable loan modification in November 2015. Moreover, those fees were waived when Plaintiff executed the March 2017 permanent loan modification that she is currently paying on. The punitive and statutory damages being sought are not independent concrete injuries – rather, they are attempts to receive additional compensation for the previously-addressed damages.

Notably, the damages sought by Plaintiff in her motion for partial summary judgment [D.E. 57] are not pled in the Second Amended Complaint.[11] The $8.55 in postage damages was for a letter sent by Plaintiff's Counsel in March 2017, a letter which is not referenced anywhere

---

[10] Furthermore, any harm that may have befallen Plaintiff related to the foreclosure action cannot be attributed to SLS. Plaintiff is the one who failed to make her monthly mortgage payments as promised in her loan and therefore she is the cause of any such harm. *See Coursen v. Shapiro & Fishman, GP*, 588 Fed. Appx. 882, 886 (11th Cir. 2014) ("…Coursen defaulted on her mortgage loan and was subject to foreclosure. Coursen complains she suffered damages in the form of losing her home, losing the equity in her home, having her credit damaged, and pain and suffering. Because these damages are attributable to Coursen's own failure to maintain her mortgage payments, Coursen cannot establish a causal link between her damages and Defendant's alleged conduct.").

[11] Plaintiff cannot change its theory of recovery "through argument at the summary judgment phase of proceedings." *Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC*, 710 F.3d 1221, 1228 (11th Cir. 2013); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 705-06 (11th Cir. 2016) ("[Plaintiff'] cannot now use his briefing [for a motion for summary judgment] to add new allegations and argue that those new assertions support his cause of action."). The proper mechanism for adding additional claims or changing theories of recovery is to amend the complaint. *Id.*

in the Complaint. It is also unclear whether Plaintiff herself actually incurred these damages, as it appears that Plaintiff's Counsel, rather than Plaintiff, actually paid the postage at issue.

Plaintiff's alleged harm is not likely to be redressed by judgment for the Plaintiff. Plaintiff seeks to have the 2015 Modification Offer be treated as an enforceable contract, despite executing a separate modification in March 2017 that expressly superseded all prior modifications. The 2017 Modification also waived all fees and costs that Plaintiff took issue with. To undo the 2017 Modification that Plaintiff is presently performing under would not redress any harm she has suffered; rather, it would cause her additional harm. As such, Plaintiff already has the modification of her loan that she was seeking through this lawsuit and any fees or costs that were allegedly improper were waived when she executed the 2017 Modification.[12] The motion to reschedule sale that Plaintiff complains of was never conducted. In fact, SLS ultimately vacated the final judgment it had against Plaintiff in the foreclosure action and dismissed the case.

As such, Plaintiff does not have Article III standing to pursue this action and this Court should enter judgment in favor of SLS at trial as to all counts.

## III.  Plaintiff's Individual Causes of Action Fail as a Matter of Law and Fact

In addition to the dispositive reasons cited *supra*, all of Plaintiff's claims fail as a matter of law and/or are unsupported by the evidence to be presented at trial.

### A.  RESPA (Loss Mitigation Procedures)

---

[12] SLS notes that the only reason certain fees and costs that SLS charged to Plaintiff's account were allegedly improper is because Plaintiff claimed she was current under the terms of the 2015 Modification Offer and could not be charged said fees and costs. As discussed in section I, the 2015 Modification Offer was not a valid, binding modification and therefore the fees and costs were appropriately added to Plaintiff's loan account.

1325174.1

Plaintiff's first count of the operative Second Amended Complaint is related to the dual tracking provisions of RESPA and 12 C.F.R. § 1024.41. [D.E. 47 at ¶¶ 17-29]. Specifically, Plaintiff alleges that SLS violated RESPA by moving to reschedule a foreclosure sale on December 22, 2015, roughly one week *after* denying Plaintiff's April loss mitigation application for failing to receive the required documents.[13] [D.E. 47]. As such, Count I is premised on Plaintiff properly complying with the 2015 Modification Offer and the same being a valid, binding agreement, as it is only because Plaintiff allegedly had a permanent modification that renders SLS's alleged conduct violative of RESPA. As discussed in section I, *supra*, this is both factually and legally incorrect and for this reason alone Count I fails and cannot result in liability as to SLS.

Count I also fails as a matter of law because Plaintiff is seeking to impermissibly go beyond the plain language and scope of RESPA. Specifically, the regulation at issue is 12 C.F.R. § 1024.41(g), which states in pertinent part:

> "If a borrower submits a complete loss mitigation application after a servicer has made the first notice or filing required by applicable law for any judicial or non-judicial foreclosure process but more than 37 days before a foreclosure sale, a servicer shall not *move for foreclosure judgment or order of sale*, or *conduct* a foreclosure sale…."

*Id.* (emphasis added). Like statutes, regulations are interpreted according to the canons of statutory construction and therefore the plain language of the regulation controls where the same is unambiguous. *See Landau v RoundPoint Mortgage Servicing Corporation*, 16-cv-62795-BLOOM/VALLE, 2017 WL 960214, at *3 (S.D. Fla. Mar. 13, 2017) *appeal docketed* No. 17-

---

[13] Plaintiff also alleges that SLS "failed to respond to Ms. Johnson's Notice of Error" dated January 4, 2016. [D.E. 47 at ¶¶ 25-28]. Since the filing of the Second Amended Complaint, Plaintiff has conceded that that January 4, 2016 letter from JALA to SLS was not a "Qualified Written Request" under RESPA and therefore is not actionable under the same. [*See* D.E. 79, Stipulated Fact #21].

1325174.1

11151 (11th Cir. Mar. 15, 2017) (citing *O'Shannessy v. Doll*, 566 F. Supp. 2d 486, 491 (E.D. Va. 2008)).

The court in *Landau* was faced with a similar situation as the present case. Specifically, a foreclosure judgment and order of sale were entered against the plaintiff in February 2016 and a sale was scheduled for October 2016. *Id.* at *1. Due to loss mitigation discussions between the plaintiff and the servicer, the servicer moved to cancel the October 2016 sale and requested the same be rescheduled for a later date. *Id.* The plaintiff alleged that the portion of the servicer's motion that sought to reschedule the foreclosure sale was a violation of 12 C.F.R. § 1024.41(g) and filed suit against the servicer. As such, the court in *Landau* stated that the question before it was "do RESPA and Regulation X prohibit a request that a foreclosure sale be rescheduled while a borrower is engaged in a modification plan, when the final foreclosure judgment and order of sale was entered prior to the commencement of the trial modification plan?" *Id.* at *3.

In analyzing this question, which is identical to the issue before this Court, the court in *Landau* looked to the plain language of 12 C.F.R. § 1024.41 and determined that the only thing a servicer is prohibited from doing once a final judgment and order of sale are entered against a borrower is to **conduct** the foreclosure sale. *Id.* at *4 (emphasis added). The *Landau* court expressly stated that there is no authority pointed to that would support the argument that "a request to reschedule a sale constitutes an order of sale covered by [12 C.F.R. § 1024.41(g)]" and that the same is "an argument based entirely in semantics that the Court finds unpersuasive." *Id.* at *3-4. As such, the court determined that it "need not construe [RESPA or 12 C.F.R. § 1024.41(g)] so liberally as to create a cause of action where none exists." *Id.* at *4.

Similarly, in the present case, a final judgment of foreclosure was entered against Plaintiff on March 2, 2015 that expressly ordered the sale of the subject property. The final

judgment and order of sale preceded the subject motion to reschedule a foreclosure sale by over nine months. As such, the only thing that SLS was prohibited from doing under 12 C.F.R. 1024.41(g) was **conducting** a foreclosure sale. *Landau*, 2017 WL 960214, at *3-4. The mere rescheduling of a sale is not a violation of the plain language of RESPA or its implementing regulation, meaning Count I fails as a matter of law.[14] For these reasons, this Court should enter judgment in favor of SLS as to Count I.

### B. FDCPA

Plaintiff's second count of the operative Second Amended Complaint is related to two distinct sections of the FDCPA. [D.E. 47 at ¶¶ 30-39]. Specifically, Plaintiff alleges that (1) SLS used false or deceptive means to collect Plaintiff's loan debt by "its wrongful refusal to honor the TPP and rescheduled her home for foreclosure sale" and (2) "contacted Ms. Johnson directly when it knew she was being represented by counsel." [D.E. 47 at ¶¶ 35, 37].[15] These claims will be addressed in turn:

1.      SLS did not use false or deceptive means to collect a debt from Plaintiff

In the Second Amended Complaint, Plaintiff alleges that SLS's decision to reschedule the foreclosure sale and not honor the TPP were violative of the FDCPA in that the same were false, deceptive, misleading, unfair, and unconscionable means to collect a debt. [D.E. 47 at ¶ 35]. Plaintiff also repeatedly states that Plaintiff was denied a review of the December 14, 2015 denial of her loan modification. [D.E. 47 at ¶ 36]. Though Plaintiff attempts to expand her claims

---

[14] Moreover, by the time the Second Amended Complaint was filed in April 2017, this claim was moot. It is undisputed that a foreclosure sale never took place and Plaintiff modified her loan with SLS in March 2017, resulting in the foreclosure judgment being vacated and the case dismissed.

[15] SLS notes that the Second Amended Complaint contains only this single conclusory sentence with respect to Plaintiff's alleged FDCPA violation for communicating directly with Plaintiff. The Pretrial Statement similarly contains no references as to which communications are at issue or are being relied on in support of this claim. [*See* D.E. 79].

1325174.1

to additional conduct in the Pretrial Statement,[16] the same is outside the pleadings of the Second Amended Complaint and is inappropriate for this Court's consideration at trial. These claims fail because SLS was allowed to reschedule the foreclosure sale, SLS honored the TPP, and SLS reviewed Plaintiff's denial as requested and provided Plaintiff with the exact reasons why her loan modification was not put into place.

The crux of Plaintiff's alleged harm appears to be related to SLS's rescheduling of the foreclosure sale. As noted in section III(A), *supra*, SLS was entitled to reschedule a foreclosure sale under RESPA's loss mitigation procedures. *See* 12 C.F.R. § 1024.41(g). Notwithstanding, Plaintiff claims this action by SLS somehow violated the TPP.[17] The TPP specifically states that "[SLS] will not **conduct** a foreclosure sale" if Plaintiff is performing under the TPP. (emphasis added). Note how Plaintiff's Counsel attempts to manipulate this language in the November 28, 2016 correspondence to SLS. Plaintiff's Counsel states that SLS promised "it would not **seek** a foreclosure sale… [and] broke that promise and is **seeking** a foreclosure sale of [Plaintiff's] property." (**emphasis added**). In doing this, Plaintiff's Counsel is insinuating that SLS promised in the TPP that it would not take any action towards a foreclosure sale, when in reality SLS promised not to **conduct** a foreclosure sale. Since it is undisputed that a foreclosure sale never took place and Plaintiff is currently living in her home under a modified loan, SLS never violated the TPP as alleged by Plaintiff.

---

[16] Specifically, in Plaintiff's Proposed Issues of Law to be Decided by the Court, Plaintiff seeks this Court to determine if SLS's correspondence to Plaintiff and Plaintiff's Counsel on December 14, 2015 and April 29, 2016 were "false or misleading" despite this conduct not being alleged in the Second Amended Complaint. [*Compare* D.E. 47 at ¶¶ 30-39 *with* D.E. 79 at 16 ¶¶ 2-3, 7-8]. As such, SLS objects to these issues being tried.

[17] To the extent Plaintiff argues SLS failed to comply with the TPP by not sending Plaintiff a permanent loan modification, the same cannot be supported by the evidence in this case. In fact, Plaintiff's entire position in this case is that she **did** receive the permanent modification and properly executed the same. As such, SLS will only address the portion of the TPP related to the continuation of foreclosure proceedings while Plaintiff is complying with the TPP.

Lastly, to the extent Plaintiff claims that SLS denied Plaintiff the opportunity to a review of her loan modification denial, the same is not consistent with the evidence in this case. On January 19, 2016, within days of receiving Plaintiff's appeal of the denial, SLS wrote to Plaintiff and stated exactly why her loan modification was denied. SLS even included the documents it received from Plaintiff to show why her submission was insufficient under the terms of the 2015 Modification Offer. Critically, SLS offered to continue working with Plaintiff to modify her loan despite the deadline passing and sent the January 2016 Modification Offer, which Plaintiff never executed and claimed she was prevented from signing by her counsel.

As such, SLS was entitled to reschedule the foreclosure sale under RESPA and did not violate any assurances made in the TPP in doing so. SLS also reviewed Plaintiff's loan modification denial and provided a substantive response to Plaintiff. As such, nothing in the Second Amended Complaint that SLS allegedly did was false, deceptive, misleading, unfair, or unconscionable because it was all authorized by law and the TPP.

2.      SLS did not communicate with Plaintiff after being notified that Plaintiff was represented by counsel with respect to the debt.

In order for Plaintiff to establish a violation of 15 U.S.C. § 1692c, Plaintiff must show that "(1) a debt collector communicated with a consumer; (2) in connection with the collection of a debt; (3) where the debt collector had actual knowledge that the consumer is represented by an attorney with respect to such debt; and (4) the debt collector had knowledge, or could readily ascertain, the attorney's name or address." *Castellanos v. Portfolio Recovery Associates, LLC*, -- F. Supp. 3d --, 2017 WL 5514368, at *7 (S.D. Fla. Nov. 3, 2017). In the present case, Plaintiff cannot establish that SLS had actual knowledge that Plaintiff was represented by counsel and subsequently communicated with Plaintiff with respect to the collection of her mortgage debt.

23

First, actual knowledge is unquestionably required to prove a violation of 12 U.S.C. § 1692c. *Id.* at *3 (citing *Erickson v. General Elec. Co.*, 854 F. Supp. 2d 1178, 1182 (M.D. Fla. 2012)). Actual knowledge requires more than tangential knowledge that a borrower has an attorney with respect to specific legal proceedings; it requires the borrower and the attorney specifically notifying a servicer that the borrower is represented with respect to the debt itself. *See Wolhuter v. Carrington Mortgage Services, LLC*, No. 8:15-cv-522-MSS-TBM, 2015 WL 12819153, at *4 (M.D. Fla. Oct. 28, 2015); *Nordwall v. PNC Mortg.*, No. 2:14-cv-747-FtM-CM, 2015 WL 4095350, at *3-5 (M.D. Fla. Jul. 7, 2015).

In the present case, Plaintiff will be unable to show SLS had actual knowledge that Plaintiff was represented by counsel because Plaintiff and Plaintiff's Counsel's own statements as to their relationship have been unclear from the beginning. Ms. Weaver, Plaintiff's housing counselor at JALA, expressly told SLS that JALA was not representing Plaintiff but were just acting in their capacity as housing counselors.[18] Plaintiff never independently informed SLS that she was represented by an attorney with respect to her debt. In fact, she did the opposite by contacting SLS directly on March 8, 2016. The only time SLS is put on actual notice that JALA was representing Ms. Johnson with respect to her debt was the March 8, 2016 call from Plaintiff to SLS. After said date, SLS ceased contact with Plaintiff directly.[19]

Second, none of SLS's communications with Plaintiff that are at issue are debt collection communications. As noted in footnote 14 *supra*, Plaintiff does not specifically allege which communications are at issue with respect to Count II. That said, the only communications that SLS had directly with the Plaintiff involve one mortgage statement that Plaintiff's Counsel has

---

[18] Notably, Ms. Weaver is not an attorney and could not be representing Plaintiff.
[19] After March 8, 2016, SLS began sending all correspondence to Plaintiff's Counsel. Plaintiff's Counsel, told SLS that he did not wish to receive routine servicing correspondence and sent SLS several correspondence advising SLS to send documents directly to the Plaintiff.

disclosed in Plaintiff's Exhibit List and the telephone calls related to the 2015 Modification Offer and January 2016 Modification Offer that are stipulated to in the Pretrial Statement. These communications are unquestionably not debt collection activities as defined by the FDCPA.

Not all communications with a represented borrower are subject to the FDCPA, such as communications with are informational in nature or unrelated to debt collection. *See Hurtubise v. PNC Bank, N.A.*, No. 512013AP000014APAXWS, 2015 WL 3948192, at *4 (Fla. Cir. Ct. Jan. 5, 2015) (citing *Parker v. Midland Credit Mgmt., Inc.*, 874 F. Supp. 2d 1353, 1355 (M.D. Fla. 2012)). In order for a direct communication from SLS to Plaintiff to be violative of the FCCPA, Plaintiff must put on evidence that said communication was related to the collection of her debt. *See* Fla. Stat. § 559.55(5); *see also Nordwall*, 2015 WL 4095350, at *3-5; *Gburek v. Litton Loan Serv. LP*, 614 F.3d 380, 385 (7th Cir. 2010). For a communication to be debt collection, the "animating purpose of the communication must be to induce payment by the debtor." *Grden v. Leikin Ingber & Winters, PC*, 643 F.3d 169, 173 (6th Cir. 2011).

Additionally, communications for informational purposes have been excluded from the FDCPA's reach as non-debt collection activity. *See Brown v. Select Portfolio Servicing, Inc.*, Case No. 16-62999-CIV-DIMITROULEAS, 2017 WL 1157253, at *2-3 (S.D. Fla. Mar. 24, 2017) (citing *Hill v. DLJ Mortgage Capital, Inc.*, No. 15-cv-3083-SJFAYS, 2016 WL 5818540, at *8-9 (E.D.N.Y. Oct. 5, 2016)). For example, periodic mortgage statements have been expressly deemed acceptable communications to continue to send to borrowers, even in cases where a plaintiff sends an express cease and desist communication (which Plaintiff did not do in the present case). *Id.*; *see also Vanecek v. DiscoverFinancial Services, LLC*, No. COCE14023621, 2015 WL 6775633 (Fla. 17th Cir. Ct. 2015) (finding that "the monthly billing statement was not an attempt to collect a debt as a matter of law"); *Havey v. Discover Financial*

*Services, LLC*, No. 2015-SC-18, 2015 WL 6965138 (Fla. 12th Cir. Ct. 2015) (finding that periodic statements "were not attempts to collect a debt in violation of the FCCPA as a matter of law"); *Implementation Guidance for Certain Mortgage Servicing Rules*, 10152013 CFPBGUIDANCE, 2013 WL 9001249 (C.F.P.B. Oct. 15, 2013).

The two communications potentially at issue in this case are a mortgage statement and calls regarding Plaintiff's loan modification. The mortgage statement is clearly not debt collection as a matter of law. *Id.* The telephone calls have been stipulated to in the Pretrial Statement as exclusively related to various modification offers – i.e. they are not calls seeking to collect a debt, but are calls to determine the status of Plaintiff's modification efforts. As such, these calls are clearly not for the animating purpose of inducing payment from the debtor. *See Grden*, 643 F.3d at 173. The most determinative fact indicating SLS was not communicating with Plaintiff regarding debt collection is the fact that her debt had already been reduced to a final judgment in March 2015. The debt was merged into the final judgment and therefore ceased to exist until SLS sold the collateral and sought a deficiency, if available.[20] As such. SLS had two choices – (1) execute on the final judgment and sell Plaintiff's home, or (2) continue to work with Plaintiff to modify her loan and keep her in the home. SLS chose to do the latter and should not be punished for successfully doing so.

### C.  RESPA (Error Resolution Procedures)

---

[20] *See, e.g., Weston Orlando Park, Inc. v. Fairwinds Credit Union*, 86 So. 3d 1186, 1187 (Fla. 5th DCA 2012) ("…when a valid and final judgment is rendered… the original debt or cause of action upon which an adjudication is predicated merges into the final judgment…."); *Hill*, 2016 WL 5818540, at *7 (finding a defendant's communications with a borrower "necessarily were sent in connection with their continued attempts to enforce [a] security interest pending the foreclosure sale" and therefore not related to the collection of a debt because of the presence of a final judgment of foreclosure as to the subject debt.).

1325174.1

Plaintiff's third count in the operative Second Amended Complaint is related to SLS's responses to various letters sent by Plaintiff's Counsel to SLS. [D.E. 47 at ¶¶ 40-64]. Specifically, Plaintiff takes issue with SLS's responses to the May 20, 2016 and November 28, 2016 correspondence from Plaintiff's Counsel to SLS.[21] Plaintiff's Counsel repeatedly insist throughout all the correspondence that Plaintiff had a valid, enforceable loan modification in November 2015. [*See* D.E. 47 at ¶ 52]. SLS proceeded to conduct an investigation into Plaintiff's claims and consistently responded that it never received two wet-ink originals back from Plaintiff. Plaintiff's argument is that SLS could not have conducted a reasonable investigation because SLS concluded that there was no valid, enforceable loan modification in November 2015.

Plaintiff's circular argument fails for a number of reasons. Namely, Plaintiff failed to trigger the error resolution procedures of RESPA and its implementing regulation, 12 C.F.R. § 1024.35, because none of Plaintiff's Counsel's letters meet the criteria of a "qualified written request." This is because Plaintiff's Counsel's letters do not relate to servicing and are duplicative. Moreover, even if SLS was obligated to conduct a reasonable investigation under RESPA, SLS addressed Plaintiff's concerns satisfied it's requirements under RESPA.

1. Plaintiff's Counsel's Letters Were Not QWRs.

A communication from a borrower to a servicer qualifies as a QWR when it: "(i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B)(i & ii). If a written inquiry does not relate to servicing, then that inquiry is not a QWR and a servicer is not required to respond to

---

[21] Plaintiff also references a January 16, 2017 letter sent by Plaintiff's Counsel to SLS. See footnote 12, *supra*.

1325174.1

said inquiry. *See Smith v. Bank of Am. Home Loans,* 968 F. Supp. 2d 1159, 1170 (M.D. Fla. 2013) ("[a] loan servicer only has a duty to respond if the information request is related to loan servicing."); *Copeland v. Lehman Bros. Bank*, 2010 WL 2817173, at *3 (S.D. Cal. 2010).[22]

The term "servicing" is narrowly defined as:

> "receiving any scheduled periodic payments from a borrower pursuant to the terms of any federally related mortgage loan, including amounts for escrow accounts… and making the payments to the owner of the loan or other third parties of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the mortgage servicing loan documents or servicing contract."

12 C.F.R. § 1024.2; *see also* 12 U.S.C. § 2605(i)(3); *Smith*, 968 F. Supp. 2d at 1170. Due to "servicing" being narrowly defined, there are certain broad categories of requests which have been excluded from RESPA's response requirement.

Specifically, requests related to loss mitigation or loan modifications cannot form the basis of a valid QWR. *See Sirote v. BBVA Compass Bank*, 857 F. Supp. 2d 1213, 1222-23 (N.D. Ala. 2010), *aff'd*, 462 Fed. Appx. 888 (11th Cir. 2012); *see also Chadee v. Ocwen Loan Servicing, LLC*, 243 F. Supp. 3d 1283, 1288 (M.D. Fla. 2017) ("[i]nquiries related to loan creation or modification do not qualify as requests related to the servicing of a loan."); *Gates v. Wachovia Mortgage, FSB*, No. 2:09-cv-02464, 2010 WL 2606511, at *3 (E.D. Cal. Jun. 28, 2010) ("Courts routinely interpret [RESPA] as requiring a QWR to relate to the *servicing* of a loan, rather than the *creation* or *modification* of a loan."); *Hudgins v. Seterus, Inc.*, 192 F. Supp. 3d 1343, 1349 (S.D. Fla. 2016) ("Plaintiff concedes that items two through five … 'deal with requests related to loan modification'... [a] number of courts have held that inquires about a loan

---

[22] The Plaintiff argues that QWRs do not have to relate to servicing after the 2014 Amendments to RESPA. This argument has been rejected by various courts, who all continue to require a QWR to relate to servicing post-amendment to RESPA. *See, e.g., Hudgins v. Seterus, Inc.*, 192 F. Supp. 3d 1343, 1349 (S.D. Fla. 2016); *Chadee v. Ocwen Loan Servicing, LLC*, 243 F. Supp. 3d 1283, 1288 (M.D. Fla. 2017).

1325174.1

modification do not relate to 'servicing' within the meaning of [RESPA]." (citing numerous authority on the issue)).

Moreover, duplicative requests will not be considered QWRs when a servicer has previously responded to the same request. Pursuant to Regulation X, servicers are not required to respond to duplicative notices of error. 12 C.F.R. § 1024.35(g)(1)(i). Specifically, Regulation X states that "[a] servicer is not required to comply with [RESPA's Error Resolution Procedures] if the servicer reasonably determines that… [t]he asserted error is substantially the same as an error previously asserted by the borrower for which the servicer has previously complied with its obligations to respond pursuant to [RESPA's Error Resolution Procedures]…." *Id.* Courts have interpreted this provision to be dispositive of RESPA claims premised on multiple notices of error. *See Eveillard v. Nationstar Mortg. LLC*, 2015 WL 1191170, at *11 (S.D. Fla. Mar. 16, 2015).

In *Eveillard*, the Plaintiffs sent both a CFPB complaint and a formal notice of error to the defendant. *Id.* at *10 The CFPB complaint was not sent to the defendant's designated address, but the defendant nevertheless responded. *Id.* When the plaintiff subsequently sent a formal notice of error, the defendant determined that the same was duplicative of the CFPB complaint and noted as such in its response. *Id.* The plaintiff, who was also represented by Mr. Golant, attempted to argue that the defendant's response was insufficient under RESPA because the CFPB complaint was not a QWR, meaning the formal notice of error was not duplicative. *Id.* The court in *Eveillard* expressly rejected this argument, finding that a servicer should not be penalized by construing its responses as inadequate in situations where the servicer is actively working to provide timely information to a borrower, even if a request is not made to a designated address." *Id.*

In the present case, Plaintiff's Counsel's May 20, 2016 and November 28, 2016 letters are clearly not QWRs. All of the issues in Plaintiff's Counsel's letters relate to loss mitigation – i.e. the 2015 Modification Offer – which does not meet the definition of "servicing" under RESPA. *See* 12 C.F.R. § 1024.2; *Sirote*, 857 F. Supp. 2d at 1222-23; *Chadee*, 243 F. Supp. 3d at 1288; *Gates*, 2010 WL 2606511, at \*3; *Hudgins*, 192 F. Supp. 3d at 1349. Specifically, the January 4 and 6, 2016 letters from JALA to SLS are solely related to the 2015 Modification Offer being denied. The May 12 and 20 letters from JALA to SLS similarly state that "SLS continues to refuse to recognize the offered and accepted [2015 Modification Offer]" as the error at issue. The November 28, 2016 letter from Mr. Golant to SLS alleged three errors all related to loss mitigation: (1) "Failure to honor the [TPP]"; (2) "Failure to honor the [2015 Modification Offer]"; and (3) "Discrepancy between conflicting loan modifications." Since Plaintiff's correspondence to SLS does not satisfy the criteria of a QWR, the same are not actionable under RESPA and SLS's obligations to respond were never triggered.

Moreover, all of the letters sent by Plaintiff's Counsel are duplicative of the very first correspondence sent on January 4, 2016. All of the letters state that SLS is refusing to honor the 2015 Modification Offer and that Plaintiff submitted the required documents. That error – i.e. failing to implement an allegedly valid loan modification – is reiterated in every correspondence sent by Plaintiff's Counsel and is duplicative of the very first correspondence on January 4, 2016. SLS responded to this error on January 29, 2017 and provided Plaintiff with all the information it had with respect to the 2015 Modification Offer, which included providing Plaintiff a copy of everything she sent in to SLS – ***one*** signed copy of the 2015 Modification Offer. Since all of Plaintiff's Counsel's letters are duplicative and SLS responded to the alleged

error on January 19, 2016, all subsequent correspondence cannot be a QWR as defined by RESPA. *See* 12 C.F.R. § 1024.35(g)(1)(i); *Eveillard*, 2015 WL 1191170, at *11.

2.    SLS Conducted a Reasonable Investigation Into Plaintiff's Claims

Despite Plaintiff failing to trigger RESPA's error resolution procedures by not submitting valid QWRs, SLS nevertheless addressed Plaintiff's multiple inquiries. Under RESPA, "a cause of action does not exist simply because a plaintiff is 'confused and/or unsatisfied with [an] answer.'" *Walker v. Branch Banking and Trust Company*, 237 F. Supp. 3d 1326, 1332 (S.D. Fla. 2017) (citing *Bates v. JP Morgan Chase Bank, N.A.*, 768 F.3d 1126, 1135 (11th Cir. 2014). "[RESPA] does not require the servicer to provide the resolution or the explanation desired by the borrower, it requires the servicer to provide a statement of its reasons." *Whittaker v. Wells Fargo Bank, N.A.*, 2014 WL 5426497, at *8 (M.D. Fla. Oct. 23, 2014).

In the present case, the entire dispute as to Count III that is set for trial on February 5, 2018 is related to Plaintiff being unsatisfied with SLS's answer to her counsel's correspondence. Plaintiff, through counsel, sent numerous correspondence to SLS asserting that the 2015 Modification Offer was a valid, binding modification. Notwithstanding the fact that SLS was not required to perform a reasonable investigation, SLS did so. SLS went through its entire file and provided Plaintiff with all of the pertinent documents for the 2015 Modification Offer, including the insufficient documents it received from Plaintiff. SLS also informed Plaintiff via the January 19, 2016 letter that it did not receive the properly executed 2015 Modification Offer. By providing this response, SLS clearly conducted a reasonable investigation and provided a statement of the reasons Plaintiff never entered into a valid, binding loan modification in November 2015. All subsequent letters that SLS sent to Plaintiff's Counsel referred back to the

31

January 19, 2016 letter or otherwise stated the same reason for SLS's denial of the 2015 Modification Offer.

For these reasons, the Court should enter judgment in favor of SLS at the February 5, 2018 trial as to Count III.

### D.  *Negligence Per Se*[23]

Plaintiff's fourth count in the operative Second Amended Complaint is a claim for negligence based on alleged violations of RESPA's error resolution procedures (i.e. Count III). Plaintiff alleges that SLS's handling of the numerous correspondence sent by Plaintiff's Counsel to SLS "demonstrated a reckless disregard of Plaintiff's right to avoid foreclosure after she successfully negotiated a loan modification agreement and complied with her obligations thereunder." [D.E. 47 at ¶ 69]. Plaintiff characterizes Count IV as a "negligence per se claim" in Plaintiff's Motion for Partial Summary Judgment. [D.E. 57 at 11].   As such, Count IV is premised entirely on two things: SLS having violated RESPA's error resolution procedures as alleged in Count III; and (2) Plaintiff properly executing the 2015 Modification Agreement and the same being a valid, binding loan modification. Both of these issues are addressed in sections I and III(C), *supra*, and SLS incorporates its arguments therein as to this claim. For the reasons more thoroughly articulated therein, Plaintiff cannot maintain a negligence cause of action against SLS.

In addition to the above, SLS is also not the cause of Plaintiff's alleged damages. After Plaintiff failed to properly execute and return two wet-ink originals of the 2015 Modification Offer, SLS extended the deadline for Plaintiff to execute a loan modification and sent Plaintiff a second modification offer to her loan on January 19, 2016. Had Plaintiff accepted the January

---

[23] SLS notes that the Plaintiff does not include any issues of law or fact to be decided related to the Plaintiff's negligence per se cause of action.

2016 Modification Offer, this case would not be going to trial on February 5, 2018. Plaintiff herself told SLS directly that she *wanted* to sign the January 2016 Modification Offer and move on, but was prevented from doing so by Plaintiff's Counsel.

Plaintiff's decision not to sign the January 2016 Modification Offer was an intervening cause of Plaintiff's alleged harm and therefore relieves SLS of any potential liability. *See Cooke v. Nationwide Mut. Fire Ins. Co.*, 14 So. 3d 1192, 1195 (Fla. 1st DCA 2009) ("…for [an intervening cause] to sufficiently absolve the negligent party, it must be independent from the original negligence, and it must not be set in motion by the original negligence" (internal quotation omitted)). At worst, Plaintiff's actions constitute a failure to mitigate her damages by refusing to sign the January 2016 Modification Offer. *See Team Systems International LLC v. Aquate Corporation*, 682 Fed. Appx. 820, 824 (11th Cir. 2017) ("…a plaintiff can recover only for that damage or loss that would have been sustained if the plaintiff had exercised such care as a reasonably prudent person would have exercised under like circumstances to mitigate the damage or loss." (internal quotations omitted)).

For these reasons, this Court should enter judgment in favor of SLS at trial as to Count IV.

### E. FCCPA

Plaintiff's fifth count in the operative Second Amended Complaint is a claim for alleged violations of the FCCPA for "claim[ing], attempt[ing], or threaten[ing] to enforce a debt when such person knows that the debt is not legitimate, or assert the existence of some other legal right when such person knows that the right does not exist." [D.E. 47 at ¶ 74]. Specifically, Plaintiff claims that SLS's violative conduct was continuing with the foreclosure action after Plaintiff allegedly modified her loan in November 2015 and sending Plaintiff mortgage statements that

did not reflect the terms of the 2015 Modification Offer. [D.E. 47 at ¶ 76-77]. As fully addressed in section I, *supra*, Plaintiff did not modify her loan and therefore the original terms and obligations remained in effect. Additionally, in a case involving identical facts, Judge Howard expressly held that the servicer was allowed to foreclose due to the modification being invalid. *Finster*, 245 F. Supp. 3d at 1320-21. As such, SLS cannot be found liable as to Count V.

Moreover, this case is identical to the *Finster* case decided by Judge Howard in that it is impossible for a plaintiff to meet the "actual knowledge" requirement under the FCCPA and prove that a servicer knew a debt was illegitimate in cases where the validity of a loan modification is in dispute. 245 F. Supp. 3d at 1320-21. In order for Plaintiff to succeed, Plaintiff would have to present evidence that SLS knew that it was bound by the 2015 Modification Offer and knew that Plaintiff's failure to send in two originals as required by the same still resulted in a valid, binding modification. *Id.* Plaintiff can put on no such evidence in this case, thus Count V fails and this Court should enter judgment in SLS's favor.

## CONCLUSION

In sum, this Court must determine on February 5, 2018 whether Plaintiff had a valid, binding loan modification in November 2015. The overwhelming evidence to be presented at trial and the case law on these issues will definitely result in a conclusion that Plaintiff failed to abide by the terms of the 2015 Modification Offer and did not enter into a valid, binding modification. Moreover, Plaintiff's lack of a concrete injury-in-fact at the inception of this case, as well as through the present, deprives Plaintiff of Article III standing. These issues are dispositive of Plaintiff's entire case, notwithstanding the fact that each claims fails independently based on the evidence and related law. As such, SLS respectfully requests that this Court enter judgment in favor of SLS.

1325174.1

Respectfully submitted,

McGLINCHEY STAFFORD
 /s/ *Derek K. Mountford*_____

N. Mark New, II, Esq.
Florida Bar # 0476773
Derek K. Mountford, Esq.
Florida Bar #127172
10407 Centurion Pkwy N., Ste. 200
Jacksonville, Florida 32256
Tel: (904) 224-4449
mnew@mcglinchey.com
dmountford@mcglinchey.com
***Attorneys for Defendant Specialized Loan***
***Servicing, LLC***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the above and foregoing has been furnished, electronically, through the CM/ECF system, to all parties on the mailing matrix, this 26th day of January, 2018.

## VIA E-FILING PORTAL

Lynn Drysdale, Esq.
Jacksonville Area Legal Aid, Inc.
126 W. Adams Street
Jacksonville, FL  32220
lynn.drysdale@jaxlegalaid.org
jalaconsumer@jaxlegalaid.org
Co-Counsel for Plaintiff Mary Johnson

Jeffrey N. Golant, Esq.
The Law Office fo Jeffrey N. Golant
1999 N. University Drive, Suite 213
Coral Springs, FL  33071
jgolant@jeffreygolantlaw.com
Co-Counsel for Plaintiff Mary Johnson

/s/Derek K. Mountford
Attorney

35

1325174.1