UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

**MARY R. JOHNSON,**
 **Plaintiff,**
v.            Case No.: 3:16-cv-00178-J-MCR

**SPECIALIZED LOAN SERVICING, LLC,**

 **Defendants.**
_____/

**PLAINTIFF MARY R. JOHNSON'S TRIAL BRIEF**

  Although this is a contentious case, there is remarkably little that is actually in dispute. The parties appear to agree that most factual disputes can be resolved by consideration of the correspondence exchanged between them. Plaintiff believes that only potentially material factual dispute concerns whether the permanent loan modification document that SLS has admitted it received from Plaintiff on November 17th, 2015 was an original or a copy. While the evidence will overwhelmingly show that it was an original, Plaintiff submits that that the issue is actually immaterial. As we explain below, Florida contract law provides that the even if there was a defect in the document, the undisputed fact that SLS accepted the trial payments is enough to form a binding loan modification agreement.

  In the pretrial stipulation, SLS has asserted a number of defensive positions, that fundamentally mischaracterize the controlling law. We address each below.

**I. UNDER FLORIDA CONTRACT LAW, THE UNDISPUTED FACTS THAT PLAINTIFF MADE THE REQUIRED TRIAL PAYMENT AND AT LEAST ATTEMPTED TO SEND SIGNED MODIFICATION DOCUMENTS TO SLS IS SUFFICIENT TO FORM A BINDING LOAN MODIFICATION AGREEMENT, EVEN IF THE DOCUMENTS SHE SENT WERE COPIES AS OPPOSED TO ORIGNAL DOCUMENTS**

1

Perhaps the only real factual dispute between the parties in this case concerns whether the documents that SLS ultimately admitted receiving from Plaintiff on November 17th, 2015 were copies of a signed loan modification agreement, or originals. While Plaintiff maintains that the evidence on this point clearly favors her version of events, the issue is actually immaterial. It is undisputed that SLS offered Plaintiff a loan modification, that she made the required trial payments, and even that she at least attempted to send SLS the required permanent loan modification documents with her signature, along with the required first payment under the permanent modification. Under Florida contract law, these undisputed facts establish that a binding loan modification agreement was formed.

In the factually similar case of *Nowlin v. Nationstar Mortg., LLC*, 193 So. 3d 1043, 1046 (Fla. 2d DCA.2016), the Court held that a mortgage servicer who accepted trial payments tendered under a trial loan modification offer had accepted the benefits under the contract, and was therefore bound to honor the loan modification. As the *Nowlin* Court explained:

> [w]hen a party accepts the benefits under a contract, courts must ratify the contract even if that party contends that it had a contrary intent. Thus, by accepting the benefits of the loan modification, Nationstar cannot now question the validity of the contract. Having entered into a valid modification agreement, Nationstar could only foreclose by alleging and proving a breach of the modification agreement and neither of which was done here.
> Id at. 1046 citing  *Stevenson v. Stevenson,* 661 So.2d 367, 369 (Fla. 4th DCA 1995).  *Kuehlman v. Bank of Am., N.A.,* 177 So.3d 1282, 1283 (Fla. 5th DCA 2015).

In the case at bar, it is undisputed that Plaintiff made the required trial payments and SLS accepted those payments. As in *Nowlin*, SLS accepted the benefits of the contract on behalf of the mortgagee, and the loan modification agreement in this case is therefore binding.

Similar to the case at bar, in *Nowlin,* the borrowers testified that they returned the signed loan modification documents in the Federal Express envelope that Nationstar provided. They also had proof that the Nationstar received those documents. *Id*. at 1245-1246.  The foreclosure plaintiff however asserted that since it had no record of receiving the permanent modification documents, the borrowers must not have returned them.  Florida's Second District however did "… not find merit in this argument, because it was the mailing of the documents that constituted an acceptance of the offer, not whether Nationstar's records showed that the documents were received." *Nowlin,* 193 So.2d at 1046.  Similarly here, SLS's own records contain an image of a signed loan modification that it received from Plaintiff in November of 2015.  SLS has no institutional knowledge reflecting that the document was a copy as opposed to an original, that is simply an inference that it asks this Court to draw based on its claim that it would have handled the documents differently if that had been originals. (Deposition of SLS Corporate Representative Fred Korb, p. 68 lines 8 – 16). While this inference is unwarranted, under *Nowlin*, it is legally irrelevant.

The facts in  *Kuehlman v. Bank of Am., N.A.,* 177 So. 3d 1282 (Fla. 5th DCA 2015) are also similar. There, Florida's Fifth District Court of appeal found that the borrower and lender entered into a binding and enforceable loan modification agreement, even though the lender claimed that the borrower submitted the modified payments late.  *Kuehlman* concluded that the late payments operated as a counter-offer, which the lender accepted. *Id.* at 1283. Here, SLS admits receiving the payments.  It has not even asserted that Plaintiff's payments were late.

## II.  SLS'S "LACK OF STANDING" AFFIRMATIVE DEFENSE IS BOTH LEGALLY AND FACTUALLY INSUFFICIENT

In its first affirmative defense, SLS asserts Plaintiff has not sustained any damages, and therefore lacks standing.  As the 11th Circuit has recently observed, "[a]n injury-in-fact, as required by Article III, "may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing...." *Church v. Accretive Health, Inc.,* 654 F. App'x 990, 993 (11th Cir. 2016) citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373, 102 S.Ct. 1114, 71 L.Ed.2d 214 (1982); *see also Palm Beach Golf Ctr.–Boca, Inc. v. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251 (11th Cir. 2015). In *Church*, the 11th Circuit held that right created by Congress when it enacted the FDPCA were sufficient to confer standing for Article III purposes *Id*. at 994-995. There is no reason why the analysis should be any different with respect to a right created by RESPA or the FCCPA. SLS will be unable to offer any authority that the right created by Congress when it enacted RESPA is insufficient to confer Article III standing, or that a right created by a state legislature is insufficient to confer Article III standing where the Court has subject matter jurisdiction. In any event, the evidence will show that Plaintiff did sustain damages, and SLS's contention to the contrary is unfounded.

## III.  THE PLAIN LANGUAGE OF THE MORTGAGE COMPELS THE CONCLUSION THAT SLS CANNOT ENFORCE THE CONTRACTUAL CONDITIONS PRECEDENT REQUIRING NOTICE AND AN OPPORTUNITY TO CURE

SLS assert in support of its Second Affirmative Defense that Plaintiff failed to comply with a pre-suit notice requirement in the mortgage.  SLS's position is completely belied by the undisputed facts that Plaintiff sent many written notices to SLS both before filing suit and before the operative Second Amended Complaint was filed.  But SLS's position is also legally untenable because the plain language of the contract creates an obligation between "Borrower"

and "Lender." Here, it is undisputed that SLS services the mortgage on behalf of a third party, and therefore is not the "Lender."

Paragraph 20 of the mortgage in this case provides:

> [n]either Borrower nor *Lender* may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action.

(D.E. 19-1, p. 13)(Emphasis added).

Essentially, SLS asks the Court to re-write the contract and replace or add the word "Servicer" where lender appears. The Court must decline that invitation. "[c]ourts may not rewrite contracts, add meaning that is not present, or otherwise reach results contrary to the intentions of the parties." *Hegel v. First Liberty Ins. Corp.*, 778 F.3d 1214, 1222 (11th Cir. 2015) citing *Interline Brands, Inc. v. Chartis Specialty Ins. Co*., 749 F.3d 962, 965 (11th Cir.2014) (quoting *Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co.,* 913 So. 2d 528, 532 (Fla.2005)) (internal quotation marks omitted).

### IV. UNDER SIMILAR FACTS, THE 11TH CIRCUIT HAS RECOGNIZED THAT THE FAILURE TO SERVICE A MODIFIFED MORTGAGE IN ACCORDANCE WITH ITS TERMS GIVES RISE TO A RESPA ERROR RESOLUTION CLAIM

SLS has also asserted that it was excused from responding to Plaintiffs RESPA correspondence because it didn't relate to "servicing." The distinction that SLS would draw between Plaintiff's concerns in her Notices of Error and "servicing" is unclear. Regardless, in the factually similar case of *Nunez v. J.P. Morgan Chase Bank, N.A.,* 648 F. App'x 905, 906

5

(11th Cir. 2016) the 11th Circuit found that a servicer's failure to adequately investigate and appropriately correct an error arising from its failure to honor a loan modification agreement gave rise to a RESPA cause of action.

### V. AS THE 11TH CIRCUIT HELD IN *RENFORE*, A MORTGAGE SERVICER CANNOT MOOT A RESPA CLAIM BY BELATEDLY CORRECTING THE ERROR THAT CAUSED THE BORROWER'S DAMAGES

Although not clear, SLS appears to assert that it can unilaterally moot Plaintiff's RESPA claim by belatedly correcting the errors long after suit was filed.[1] Presumably, by doing that, SLS could thereby avoid a claim for prevailing party attorneys' fees, and possibly even pursue taxable costs. Once again, SLS's view is inconsistent with the 11th Circuit's.

In *Renfroe v. Nationstar Mortg., LLC*, 822 F.3d 1241, 1246–47 (11th Cir. 2016), the 11th Circuit rejected a similar argument observing that:

> … a servicer notified of an account error could always avoid RESPA liability just by claiming it thought there was no error and correcting the error going forward. According to Nationstar, a RESPA cause of action would not accrue in this situation—despite the abusiveness of the tactic. We reject such a cramped reading of RESPA. When a plaintiff plausibly alleges that a servicer violated its statutory obligations and as a result the plaintiff did not receive a refund of erroneous charges, she has been cognizably harmed.

*Id.* at 1246-1247

Similarly in *Zinni v. ER Sols., Inc.,* 692 F.3d 1162, 1168 (11th Cir. 2012), a settlement offer that included the amount of statutory damages sought, along with reasonable attorney's

---

[1] Importantly, these belated corrections do not eliminate all of Plaintiff's pecuniary damages. At the very minimum she incurred expenses in sending her multiple RESPA notices.

fees, was not sufficient to render the FDPCA plaintiffs' claims moot. In reaching that result, the Court reasoned:

> A judgment is important to Appellants because the district court can enforce it. Instead, with no offer of judgment accompanying Appellees' settlement offers, Appellants were left with a mere promise to pay. If Appellees did not pay, Appellants faced the prospect of filing a breach of contract suit in state court with its attendant filing fees—resulting in two lawsuits instead of just one.

It is unlikely that SLS will be able to offer any authority for the proposition that a defendant's unilateral conduct can moot a claim under a federal consumer protection statute. Here, the unilateral credits that SLS applied to Plaintiff's account are even less enforceable than the legally enforceable offer in *Zinni*. There is nothing to stop SLS from unilaterally applying any charges or credits to a borrower's account. Taken it its logical conclusion. SLS would be free to impose erroneous charges on a borrower, reverse those charges once a RESPA claim is filed, and then apply those charges once again after successfully asserting that the RESPA claim was moot. The 11th Circuit rejected the similar "abusive[] tactic" described above in *Renfroe*. As the 11th Circuit observes in *Renfroe*, allowing such a procedure would all but render RESPA unenforceable.

### VI. THE PLAIN LANGUAGE OF THE FDCPA, RESPA, AND THE FCCPA DO NOT REQUIRE AUTHORIZE A DEFENSE OF FAILURE TO MITIGATE DAMAGES

There is nothing in the text of the FDCPA, RESPA, or the FCCPA that imposes an obligation on the consumer to mitigate damages. To the contrary, RESPA unconditionally imposes liability for "any actual damages to the borrower as a result of the failure" to comply with RESPA's obligations. It does not impose liability for damages that the borrower failed to mitigate. Similarly, the FDCPA and FCCPA authorize recovery of statutory damages even in the absence of any actual damages at all.

As the Eleventh Circuit has explained "[w]e begin our construction of [a statutory provision] where courts should always begin the process of legislative interpretation, and where they often should end it as well, which is with the words of the statutory provision." *CBS Inc. v. Prime Time 24 Joint Venture*, 245 F.3d 1217, 1222 (11th Cir. 2001) citing *Harris v. Garner,* 216 F.3d 970, 972 (11th Cir.2000) (en banc). The relevant statutory language is clear. There is nothing that suggests any duty to mitigate damages. While the duty to mitigate damages is a well-established common law principal, it does not necessarily follow that either Congress or the Florida legislature intended to incorporate it as a defense to a statutory cause of action.

Conversely, in the Title VII context, a plaintiff pursuing a federal statutory claim is under a duty to mitigate damages in connection with a claim for back pay. However, the basis of this duty comes from the statutory itself, not common law. *See generally Booker v. Taylor Milk Co.*, Inc. 64 F.3d 860, 865 (3d Cir. 1995)(describing the Title VII Plaintiff's "statutory duty" to mitigate damages). Thus, if Congress intended to impose upon FDCPA or RESPA plaintiffs the duty to mitigate damages, it knew how to do so. This Court should not infer that Congress intended to impose this obligation when there is nothing the text of the statute to support such a conclusion. Nor should it draw any similar inferences regarding the Florida legislature and the FCCPA.

## VII. THE FDCPA DOES NOT REQUIRE PLAINTIFF TO PROVE THAT SHE NOTIFIED SLS THAT SHE WAS REPRESENTED OR THAT SHE NO LONGER WISHED TO RECEIVE COMMUNICATIONS DIRECTLY FROM SLS

SLS appears to assert that, for purposes of her FDPCA claim, Plaintiff must prove that she "provided SLS with notice that Plaintiff was represented by Plaintiff's counsel with respect to a debt and no longer wished to be communicated with directly." (Pretrial Stipulation D.E. 79, p. 17). SLS however misreads the statute. Under 15 U.S.C 1692(c)(A)(2), if the debt collector

knows that a consumer is represented by an attorney, it may not contact the borrower without the consumer's attorney's consent. SLS will find no support for the proposition that the prohibition of direct contact only applies where it is affirmatively invoked by the consumer.

Furthermore, SLS has made no effort to raise a "bona fide error" defense. The "FDCPA does not ordinarily require proof of intentional violation and, as a result, is described by some as a strict liability statute." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1190 (11th Cir. 2010) citing 15 U.S.C. § 1692k; *Ellis v. Solomon and Solomon, P.C.,* 591 F.3d 130, 135 (2nd Cir.2010). Nevertheless, "the FDCPA affords a narrow carve-out to the general rule of strict liability, known as the 'bona fide error' defense. *Owen v. I.C. Sys., Inc.,* 629 F.3d 1263, 1271 (11th Cir. 2011). The "bona fide error" defense is an affirmative defense that the debt collector must plead and prove. *See E.g. Edwards v. Niagara Credit Sols., Inc.,* 584 F.3d 1350, 1352 (11th Cir. 2009). Failure to plead an affirmative defense generally results in a waiver of that defense." *See Keybank Nat'l Ass'n v. Hamrick*, 576 F. App'x 884, 888 (11th Cir. 2014), citing *Latimer v. Roaring Toyz, Inc.,* 601 F.3d 1224, 1239 (11th Cir.2010); *Hassan v. U.S. Postal Serv.,* 842 F.2d 260, 263 (11th Cir.1988).

Accordingly, SLS must be held strictly liable for placing unlawful phone calls to Plaintiff. Having failed to raise any bona fide error defense, SLS improperly attempts to shift the burden to Plaintiff to prove an intentional violation. SLS's position is meritless.

**RESPECTFULLY SUBMITTED,**

/**s**/ **Jeffrey N. Golant**
Jeffrey N. Golant Esquire
Fla. Bar No. 070773
THE LAW OFFICES OF JEFFREY N. GOLANT,
7301 Wiles Rd. Ste. 201

Coral Springs, FL 33067
Tel:   (954)942 5270
Fax:   (954) 942-5272
jgolant@jeffreygolantlaw.com
Co-counsel for Plaintiff Mary Johnson


Lynn Drysdale, Esquire
Fla. Bar No.: 608489

Jacksonville Area Legal Aid, Inc.
126 W. Adams Street
Jacksonville, Florida 32202
Telephone:  (904) 356-8371, ext 306
Facsimile: (904) 515-2662
lynn.drysdale@jaxlegalaid.org
jalaconsumer@jaxlegalaid.org
Co-counsel for Plaintiff Mary Johnson


## CERTIFICATE OF SERVICE

The undersigned counsel hereby certifies that the foregoing document was electronically filed and served this 26th day of January 2018 by using the CM/ECF system and served upon the following counsel of record:

N. Mark New II, Esq.
Email: mnew@mcglinchey.com Derek Mountford, Esq.
Email: dmountford@mcglinchey.com
McGlinchey Stafford
10407 Centurion Pkwy, North, Suite 200
 Jacksonville, Florida 32256
904-224-4499
Counsel for Defendant Specialized Loan Servicing LLC.



\s\Jeffrey N. Golant