**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

MARY R. JOHNSON,

     Plaintiff,

                                       CASE NO. 3:16-cv-178-J-MCR

v.

SPECIALIZED LOAN SERVICING, LLC,

     Defendant.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

     This action for damages came before the Court for a bench trial on February 5 and 6, 2018. After reviewing the parties' proposed findings of fact and conclusions of law, the Court is now prepared to decide the case.

## PROCEDURAL HISTORY

     On January 11, 2016, Plaintiff Mary Johnson filed a Complaint against Specialized Loan Servicing, LLC ("SLS") and The Bank of New York Mellon f/k/a the Bank of New York, as Trustee for the Certificate Holders of the CWABS, Inc., Asset-Backed Certificates, Series 2006-26 ("BONY"), in the Small Claims Court of the Fourth Judicial Circuit, in and for Duval County, Florida, Case. No. 16-2016-SC-000151-XXXX-MA. (Doc. 2.) The Complaint alleged that Defendants violated the Real Estate Settlement Procedures Act ("RESPA") (loss mitigation procedures) and the Fair Debt Collection Practices Act ("FDCPA"). Defendants removed the Complaint to this Court on February 24, 2016. (Doc. 1.) On April

1

26, 2016, all parties consented to this case being heard by the undersigned. (Doc. 10.) On April 12, 2017, Plaintiff filed the operative Second Amended Complaint in this action, which excluded BONY as a defendant. (Doc. 47.) In the Second Amended Complaint, Plaintiff asserted the original RESPA (Count I) and FDCPA (Count II) claims against SLS, the only remaining defendant, but added counts against SLS pursuant to RESPA (error resolution procedures) (Count III); common law negligence (Count IV); and the Florida Consumer Collection Practices Act ("FCCPA") (Count V). (*Id.*) On May 31, 2017, the Court entered an Amended Case Management and Scheduling Order which, *inter alia*, set this case for a bench trial commencing on February 5, 2018. (Doc. 56.) On November 17, 2017, SLS filed its Answer and Affirmative Defenses to the Second Amended Complaint. (Doc. 71.) On January 3, 2018, the parties filed their Joint Pretrial Statement. (Doc. 79.) On January 9, 2018, the parties appeared before the undersigned at the Final Pretrial Conference. (Doc. 83.) Trial was held before the undersigned on February 5 and 6, 2018.

## FINDINGS OF FACT

1. The subject mortgage is a "federally related mortgage" and therefore RESPA applies. (Doc. 79 at 13.)

2. SLS services Plaintiff's mortgage loan on behalf of a third party. (*Id.*)

3. SLS began servicing Plaintiff's mortgage loan on December 6, 2011. (*Id.*)

4.     At the time that SLS began servicing the loan, it regarded the loan as being delinquent.  (*Id.*)

5.     Plaintiff had a foreclosure final judgment entered against her on March 2, 2015.  (*Id.*)  After entry of the Final Judgment of foreclosure, Plaintiff, through the assistance of housing counselor Karen Weaver at Jacksonville Area Legal Aid, submitted a loss mitigation application to SLS for review on April 22, 2015.  (Docs. 79 at 13; 100 at 27-29.)  Ms. Johnson authorized SLS to speak with Ms. Weaver as an "authorized third party."  (Doc. 100 at 177.)  As an authorized third party, Ms. Weaver could call in and assist Plaintiff with submitting documentation or finding out the status of an application.  (*Id.*)

6.     SLS approved Plaintiff's application for a loan modification on June 2, 2015.  (Doc. 79 at 14.)

7.     The loan modification for which Plaintiff was approved was a "Home Affordable Modification" or "HAMP" modification offered pursuant to a program involving the United States Treasury.  (*Id.*)

8.     The HAMP modification required Plaintiff to make three "trial payments" before the modified terms would become permanent.  (*Id.*)

9.     Plaintiff made the required trial payments.  (*Id.*)

10.     SLS then sent Plaintiff an offer to accept a permanent loan modification on September 22, 2015 (the "2015 Modification Offer").  (Doc. 79 at 14; Ex. 27.)

11.    However, Plaintiff did not receive the 2015 Modification Offer when it was initially sent by SLS.  (Doc. 100 at 29-31, Exs. 36 & 37.)

12.    On November 9, 2015, Ms. Weaver contacted SLS on Plaintiff's behalf regarding the 2015 Modification Offer.  (*Id.*)  Specifically, Ms. Weaver notified SLS that Plaintiff had made the required trial payments and was expecting to receive the 2015 Modification Offer, but never received the offer.  (*Id.*)

13.    In light of that conversation, SLS advised that it would resend the 2015 Modification Offer to Ms. Weaver via email and agreed to extend the deadline for Plaintiff to execute the offer.  (Ex. 36.)

14.    Ms. Weaver did not obtain the 2015 Modification Offer via email on November 9, 2015.  (Doc. 100 at 31.)  Ms. Weaver re-contacted SLS the following day.  (*Id.*)  SLS then faxed the 2015 Modification Offer to Ms. Weaver.  (Doc. 100 at 32-34; Ex. 37.)   Ms. Weaver received the 2015 Modification Offer on November 12, 2015.  (Doc. 100 at 34.)

15.    The terms in "Step One" of the 2015 Modification Offer state in pertinent part:

How to accept this offer:

**STEP 1   COMPLETE AND RETURN THE ENCLOSED AGREEMENT BY THE DUE DATE**

To accept this offer, [Plaintiff] must sign and return both originals of the Modification Agreement to [SLS] in the enclosed, pre-paid envelope by October 31, 2015. If the Modification Agreement has notary provisions at the end or attached, [Plaintiff] must sign both

original Modification Agreements before a notary public and return
the notarized originals to [SLS]. We encourage [Plaintiff] to make a
copy of all documents for [he]r records. If [Plaintiff] do[es] not send
both signed originals of the Modification Agreement by the above
date, [she] must contact [SLS] if [she] still wish[es] to be considered
for this program and have [he]r loan modified."

(Ex. 27.)

16.     Although SLS agreed to extend the original deadline for Plaintiff to

execute the 2015 Modification Offer and Ms. Weaver did not receive the offer

until November 12, 2015, the offer faxed to Ms. Weaver contained the original

deadline of October 31, 2015.  (Doc. 100 at 29-34; Exs. 27, 36-37.)

17.     Ms. Weaver had Plaintiff sign and notarize the 2015 Modification

Offer.  (Doc. 100 at 34.)  Ms. Weaver then sent at least one executed document

and the first $808 loan modification payment to SLS.  (Docs. 79 at 14; 100 at 34,

47-48.)

18.     SLS received the executed 2015 Modification Offer on November

17, 2015.  (Docs. 79 at 14; 100 at 34-35; Exs. 22, 29.)

19.     SLS then sent Plaintiff a letter dated December 14, 2015, advising

that Plaintiff's loan modification had been denied.  (Docs. 79 at 14; 100 at 35-36,

50-51, 195; Ex. 1.)

20.     The December 14, 2015 denial letter states that it is a

communication from a debt collector attempting to collect a debt.  (Ex. 1.)  The

letter also states, in pertinent part:

[SLS is] unable to complete [Plaintiff's] modification offered through
the Making Home Affordable (MHA) program because [she] did not

sign and return final modification documents by the specified due date. [Plaintiff is] no longer eligible for the Making Home Affordable (MHA) program.

(Ex. 1 (emphasis added).)

21. It appears that the explanation for the denial in the December 14, 2015 letter was left intentionally vague.[1] (Doc. 100 at 36, 50-52; Exs. 1, 10 at 690, 36.)

22. The December 14, 2015 denial letter also provided Plaintiff with an opportunity to obtain a second independent review of the denial. (Ex. 1.) Specifically, the letter gave Plaintiff:

[T]he right to request a second independent review to determine [he]r eligibility for a loan modification. To request a second review, [Plaintiff] must send [SLS he]r request in writing which must be received by [SLS] no later than January 13, 2016 . . . If the property is [Plaintiff's] primary residence, this is [he]r first evaluation and [he]r request is received in the disclosed time frame, [SLS] **will not initiate or continue with foreclosure during the review process**.

(*Id.* (emphasis added).) The Court finds that this provision qualified as a right to initiate an appeal process pursuant to 12 U.S.C. § 1024.41(h).

23. SLS had no intention of providing Plaintiff with a second independent review of the loan modification as evidenced by its filing of a Motion

---

[1] The emphasis in the reason for the denial appears to be placed on the fact that Plaintiff failed to execute the modification documents by the specified deadline of October 31, 2015, although SLS extended the deadline to respond to the 2015 Modification Offer. (Doc. 100 at 36, 50-52; Ex. 36.) SLS appears to place the emphasis on the fact that Plaintiff "*did not sign and return the [required] documents*" by the deadline. (Doc. 100 at 195, 197.)

to Reschedule the Foreclosure Sale in the underlying foreclosure action on December 22, 2015.  (Doc. 79 at 14; Ex. 4.)

24.     On that same date, Ms. Weaver filed a complaint with the Consumer Financial Protection Bureau ("CFPB") on Plaintiff's behalf.  (Doc. 100 at 37-38; Exs. 2 at 226; 8.)  The CFPB complaint explained that Plaintiff made the required trial payments and executed the loan documents in a timely manner, but SLS wrongfully denied her loan modification as untimely.  (Exs. 2 at 226; 8.)

25.     On January 4, 2016, Plaintiff sent SLS's foreclosure counsel correspondence asserting that the December 14, 2015 denial letter was erroneous.  (Doc. 79 at 14-15; Ex. 7.)  Plaintiff specifically explained that SLS was wrong in denying the loan modification as untimely because SLS's representative agreed to extend the October 31, 2015 deadline to execute the documents, and Plaintiff sent the executed documents as soon as they were received.  (Ex. 7.)

26.     Plaintiff also filed a response in opposition to the Motion to Reschedule the Foreclosure Sale on that date.  (Doc. 79 at 14; Ex. 21.)

27.     On January 6, 2016, Plaintiff timely provided SLS with a written request for a second independent review as provided under the December 14, 2015 denial letter.  (Doc. 100 at 72; Ex. 9.)   The request for a second independent review also explained that SLS's denial of the loan modification as untimely was erroneous due to the extension of time provided.  (Ex. 9.)  SLS

received the request for a second independent review in a timely manner.  (Doc. 100 at 241-42.)

28.     SLS never specifically responded to Plaintiff's request for a second independent review of the loan modification denial.  (Doc. 100 at 241-44; Ex. 29.)

29.     On January 19, 2016, SLS responded to the CFPB complaint.  (Ex. 29.)  SLS stated that "[a]ccording to [its] records, the final modification documents were received via fax on November 16, 2015, after the October 31, 2015 deadline."  (*Id.*)  SLS further stated "[a]s a courtesy, at this time, SLS has elected to reopen the loss mitigation process to extend [Plaintiff] the offer previously extended, as [Plaintiff] had not submitted a 'wet ink' copy of the previous modification."  (*Id.*)  Once again, it appears that SLS's reason for the denial was left intentionally vague.  It is also unclear whether SLS was attempting to correct its past error by offering Plaintiff a new loan modification agreement.  The terms of the loan modification offered on January 19, 2016 differed from the terms offered in the 2015 Modification Offer.  (Doc. 100 at 42.)  Namely, the January 19, 2016 modification offer increased the principal balance and decreased the deferred amount at the end of the loan.  (Doc. 100 at 43; Ex. 5 at 401.)

30.     Plaintiff did not accept the January 19, 2016 modification offer.  (Doc. 100 at 201-02, 208-09; Ex. 18.)

31.     On May 20, 2016, Plaintiff's counsel sent SLS a Notice of Error that triggered a duty to respond by SLS under RESPA.[2] (Doc. 79 at 15; Ex. 6.)  The May 20, 2016 Notice of Error, *inter alia*, advised SLS that it improperly denied the 2015 Modification Offer.  (Ex. 6.)

32.     On June 20, 2016, SLS responded to the May 20, 2016 Notice of Error pursuant to RESPA.  (Ex. 2.)  The June 20, 2016 letter references SLS's January 19, 2016 loan modification offer presented to Plaintiff and encloses that offer.  (*Id.*)  The letter states that the *January 19, 2016 offer* was properly denied as Plaintiff failed to timely respond to that offer.  (*Id.* (emphasis added).)  The letter does not address the reason for SLS's denial of the 2015 Modification Offer, and merely concludes that SLS researched Plaintiff's account and determined no error occurred.  (*Id.*)

33.     On November 28, 2016, Plaintiff sent a second Notice of Error to SLS pursuant to RESPA.  (Ex. 16.)  The November 28, 2016 Notice of Error asserted that SLS erred in resetting the foreclosure sale while Plaintiff was complying with the trial plan period, in denying the 2015 Modification Offer as untimely, and in presenting the January 19, 2016 offer with differing terms.  (*Id.*)

34.     On December 15, 2016, SLS responded in writing to the November 28, 2016 Notice of Error.  (Ex. 3.)  The December 15, 2016 letter does not address the reason for SLS resetting the foreclosure sale.  (*Id.*)  The December

---

[2] Plaintiff sent a similar letter on May 12, 2016 to SLS's foreclosure counsel that did not trigger a duty to respond under RESPA.  (Ex. 25.)

15, 2016 letter was also left intentionally vague with respect to SLS's denial of the 2015 Modification Offer, stating that with respect to "the *April 2015 modification efforts*, [SLS] w[as] unable to finalize the modification as [it] did not receive signed final modification documents." (*Id.*)  The letter states with respect to the Plaintiff's concerns regarding "the *November 2015 modification efforts*, our records indicate that [a new loan modification offer] dated November 21, 2016 was sent [to Plaintiff]." (*Id.* (emphasis added).)  The letter also does not address why a discrepancy in terms existed between the 2015 Modification Offer and the January 19, 2016 offer, except to state that the "foreclosure fees have been confirmed as valid and [SLS] is unable to waive them at this time." (*Id.*)

35.     As a result, Plaintiff sent a third Notice of Error to SLS on January 17, 2017.  (Ex. 14.)  The third Notice of Error advised that SLS was required to conduct a reasonable investigation and to notify Plaintiff of the reason or reasons why no error occurred.  (*Id.*)  The third Notice of Error further advised that the prior correspondence received from SLS did not contain the required statements, as the prior correspondence from SLS merely referenced the November 2016 loan modification offer in response to why the 2015 Modification Offer was denied.  (*Id.*)

36.     SLS responded to the third Notice of Error in writing on February 9, 2017.  (Ex. 26.)   In that letter, SLS states that Plaintiff was responsible for contacting SLS in the event she "did not send both signed originals of the Modification Agreements by [October 31, 2015]." (*Id.*)  The letter further provides

that SLS attempted to contact Plaintiff about the 2015 Modification Offer, and that

Ms. Weaver spoke with a representative of SLS in November 2015. (*Id.*)

Notably, the letter does not mention that the representative provided Plaintiff an

extension of time to execute the 2015 Modification Offer. (*Id.*) The letter

ultimately concludes that:

> On November 17, 2015, SLS received correspondence from
> [Plaintiff]. At this time, however, it is *uncertain* whether the
> correspondence received by SLS was the "wet ink" signed [2015
> Modification O]ffer. Due to the fact that the documents were
> received after the deadline of October 31, 2015, coupled with the
> fact that [Plaintiff] was not in contact with SLS, we were unable to
> complete the modification.

(*Id.* (emphasis added).)

37. On March 1, 2017, Plaintiff sent a fourth Notice of Error entitled

"Supplemental Qualified Written Request Containing a Notice of Errors." (Ex.

15.) The fourth Notice of Error reiterated, *inter alia*, Plaintiff's position that she

never received a clear explanation as to why the 2015 Modification Offer was

denied. (*Id.*) Plaintiff incurred debt in the amount of $8.55 for postage paid as a

result of sending out the fourth Notice of Error. (Doc. 100 at 86-87; Ex. 13.)

38. SLS responded to the fourth notice of error on April 11, 2017. (Ex.

5.) SLS's letter describes Plaintiff's account history. (*Id.*) The letter reiterates

that SLS "was *uncertain* whether the correspondence received by SLS was the

'wet ink' signed [2015 Modification O]ffer." (*Id.*) The letter also reiterates that

SLS was unable to complete the modification due to the fact that the documents

were received after the October 31, 2015 deadline coupled with the fact that

Plaintiff was not in contact with SLS. (*Id.*) The letter references a March 7, 2017 loan modification offer with terms more favorable to Plaintiff (including $33,060.80 in principal forgiveness) than the 2015 Modification Offer. (*Id.*)

39. The parties ultimately entered into the March 2017 loan modification. (Doc. 79 at 15.) Plaintiff's account was brought current and all delinquency and attorneys' fees were removed. On March 21, 2017, SLS caused the final judgment of foreclosure against Plaintiff to be vacated and the foreclosure action to be voluntarily dismissed. (*Id.*)

40. As a result of SLS's actions, Plaintiff testified that she suffered emotional distress. Specifically, Plaintiff stated:

> Well, during the time when I was going through all of this, my sister took [sic] sick and she passed away. And I had to take in three more people, which was a foster daughter and the two kids. And they w[ere] mentally challenged. So I had a little baby in the house.
>
> And foreclosure was, like, an ongoing process. And it kept going on. And every time we, you know, got it denied and another one would come. So this put me into a panic and raised my blood pressure, as well, and had to go on blood pressure medicine.
>
> So I was just – started having panic attacks and getting overanxious, because I thought I was going to be put out with these people that – I had now inherited in my home. And I just, you know, was really afraid that I wasn't going to have nowhere [sic] to stay. So I just started panicking.

(Doc. 100 at 84-85.)

41. SLS's corporate representative, Laura Ollier, testified at trial that the 2015 Modification Offer was denied solely because Plaintiff failed to submit two "wet-ink" originals of the 2015 Modification Offer, and that SLS made the reason

for that denial clear in written correspondence.  (Doc. 100 at 195-198, 205, 208-09, 213-14, 216, 230-31, 234.)

## CONCLUSIONS OF LAW

Having made the above findings of fact pertinent to the causes of action at issue, the Court reaches the following conclusions of law:

### The Court Need Not Decide the Contractual Nature of the Loan Modification

1.     Contrary to the parties' position on this issue, the Court concludes that it need not decide whether Plaintiff entered into a valid, binding loan modification in November 2015.  Plaintiff does not assert a breach of contract claim (or any other contractual claim) so that issue is not properly raised before the Court.  *See Finster v. U.S. Bank N.A.*, 245 F. Supp.3d 1304, 1317 n.14 (M.D. Fla. 2017) (noting that the issue of whether the servicer was bound by the loan modification agreement and, if so, whether the servicer violated a provision of that agreement by failing to send the plaintiff written notice of the error should be raised in a breach of contract claim, not RESPA).

### Article III Standing

2.     For a plaintiff to have Article III standing, he or she must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that it is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robbins*, 136 S. Ct. 1540, 1547 (2016) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) & *Friends of the Earth, Inc. v. Laidlaw Environmental Serv. (TOC), Inc.*, 528 U.S. 167, 180-81 (2000)).

13

Standing must be present at the inception of a case in order for a plaintiff to be able to bring a lawsuit. *See Paradise Creations, Inc. v. UV Sales, Inc.*, 315 F.3d 1304, 1308 (Fed. Cir. 2003) ("Article III standing, like other bases for jurisdiction, generally must be present at the inception of the lawsuit."); *Lujan*, 204 U.S. at 570 n.5 ("[S]tanding is to be determined as of the commencement of suit.").

3.     "To establish an injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Spokeo*, 136 S. Ct. at 1548 (citing *Lujan*, 540 U.S. at 560). For an injury to be concrete, it must be more than "a bare procedural violation, divorced from any concrete harm." *Id.* at 1549.

4.     Here, Plaintiff has shown that Article III standing exists. As the Eleventh Circuit has recently observed, "[a]n injury-in-fact, as required by Article III, 'may exist solely by virtue of statutes creating legal rights, the invasion of which creates standing . . . .'" *Church v. Accretive Health, Inc.*, 654 F. App'x 990, 993 (11th Cir. 2016) (quoting *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 373 (1982) & citing *Palm Beach Golf Ctr. – Boca, Inc. v. Sarris, D.D.S., P.A.*, 781 F.3d 1245, 1251 (11th Cir. 2015)). Plaintiff has alleged the invasion of legal rights created by federal statutes such as RESPA, 12 U.S.C. § 2605(f), and FDCPA, 15 U.S.C. § 1692k(a). *Church*, 654 F. App'x at 994. Notwithstanding SLS's argument to the contrary, Plaintiff presented sufficient evidence to show

that she sustained a concrete and particularized injury as a result of the conduct

alleged in the Second Amended Complaint, as explained further below.

## Count I (RESPA – Loss Mitigation Procedures)

5.      Plaintiff identified the following issues of law relevant to Count I:

Whether RESPA and Regulation X (12 C.F.R. §1024.41) prohibited
the rescheduling of a foreclosure sale after the purported denial of a
loss mitigation application, but prior to the deadline to appeal had
expired.

Whether Plaintiff "fail[ed] to perform under an agreement on a loss
mitigation option" such that SLS violated the prohibition against
pursuing a foreclosure sale set forth in 12 C.F.R. §1024.41(g)(3)
under the circumstances presented in this case.

(Doc. 79 at 20.)

6.      The issue of law presented is:

Whether SLS's December 22, 2015 motion to reschedule the
foreclosure sale in the underlying foreclosure action violated
RESPA.

(*See id.* at 21.)  The Court concludes in the affirmative and finds in favor of

Plaintiff on Count I.

7.      12 C.F.R. § 1024.41(g) provides:

If a borrower submits a complete loss mitigation application after a
servicer has made the first notice or filing required by applicable law
for any judicial or non-judicial foreclosure process but more than 37
days before a foreclosure sale, a servicer shall not move for
foreclosure judgment or order of sale, or conduct a foreclosure sale
unless:

(1) The servicer has sent the borrower a notice pursuant
to paragraph (c)(1)(ii) of this section that the borrower is
not eligible for any loss mitigation option and the appeal

process in paragraph (h) of this section is not
applicable, the borrower has not requested an appeal
within the applicable time period for requesting an
appeal, or the borrower's appeal has been denied;

(2) The borrower rejects all loss mitigation options
offered by the servicer; or

(3) The borrower fails to perform under an agreement
on a loss mitigation option.

8.    SLS's December 14, 2015 denial letter provided Plaintiff an appeal

deadline under RESPA of January 13, 2016.  (Doc. 100 at 72; Ex. 1 ("To request

a second independent review [Plaintiff] must send us [he]r request in writing

which must be received by us no later than January 13, 2016).)  The denial letter

provided that SLS would not "*initiate or continue with foreclosure* during the

review process."  (Ex. 1 (emphasis added).)  Plaintiff initiated the appeals

process by providing SLS with a written request prior to the January 13, 2016

deadline.  (Ex. 9.)  Nevertheless, SLS initiated or continued with foreclosure

during the review process by filing a motion to reschedule the foreclosure sale in

the underlying foreclosure action on December 22, 2015.  (Ex. 4.)  SLS violated

RESPA by doing so.

9.    SLS argues that the plain language of 12 C.F.R. § 1024.41(g) only

prohibits it from conducting a foreclosure *sale* of the property and, because SLS

ultimately never actually sold Plaintiff's property, it did not violate RESPA.  In

support, SLS relies on the holding of a case out of the Southern District of Florida

that is currently on appeal.  *See Landau v. RoundPoint Mort. Serv. Corp.*, 16-cv-62795-BLOOM/VALLE, No. 2017 WL 960214, at *3 (S.D. Fla. Mar. 13, 2017), appeal docketed No. 17-11151 (11th Cir. Mar. 15, 2017).  This Court is not bound by the *Landau* decision.  While the court in *Landau* interpreted what is required under the RESPA regulation, the difference here is that SLS broadened the scope of its duty under the regulation by agreeing not to "initiate or continue with foreclosure during the review process."  (Ex. 1.)  The Court concludes that SLS violated RESPA by filing a motion to reschedule the foreclosure sale during the review process when SLS agreed not to do so, and that Plaintiff suffered damages as a direct result of the violation.  Moreover, the Court concludes that in failing to specifically respond to the appeal request, SLS violated RESPA by failing to state "whether [it] will offer [Plaintiff] a loss mitigation option based upon the appeal."  12 C.F.R. § 1024.41(h)(4).

### Count II (FDCPA)

10.     SLS similarly violated the FDCPA by making a misleading and deceptive representation in the denial letter.  As an initial matter, the Court concludes that SLS was a debt collector as it acquired the loan at issue while the loan was in default.  *Goodin v. Bank of America, N.A.*, 114 F. Supp. 3d 1197, 1204 (M.D. Fla. 2015).  Contrary to SLS's position, the Court also concludes that the December 14, 2015 denial letter qualified as a debt communication.  "When determining whether a communication is 'in connection with the collection of any debt,' this Circuit 'look[s] to the language of the communication in question—

specifically to statements that demand payment and discuss additional fees if payment is not tendered.'" *Foster v. Green Tree Servicing, LLC*, No. 8:15-cv-1878-T-27MAP, 2017 WL 5151354, at *6 (Nov. 3, 2017) (quoting *Farquharson v. Citibank, N.A.*, 664 F. App'x 793, 801 (11th Cir. 2016)). Statements in a letter demanding full and immediate payment, threats that unless the payment was made attorneys' fees would be added, statements that the law firm was "attempting to collect a debt and was acting as a debt collector" or that the communication was for the purposes of collecting a debt, and references to collection efforts are all examples of debt collection communication. *Id.*

11.    Here, the December 14, 2015 denial letter offered Plaintiff the option to repay the debt owed, sell her property in a short sale, or deed her property to SLS. (Ex. 1 at 53.) Moreover, the letter admits that it is "from a debt collector" and is "an attempt to collect a debt."[3] The December 14, 2015 denial letter directly relates to Plaintiff's debt, and it is apparent that its purpose was to induce Plaintiff to make a payment.

12.    Utilizing the "least sophisticated consumer" standard as this Court must, *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1193 (11th Cir. 2010), it concludes that the December 14, 2015 denial letter contained a misleading and deceptive material representation in violation of 15 United States Code Section

---

[3] While the last page of the letter states that the purpose of the communication is to offer Plaintiff loss mitigation assistance, such a statement is incongruous with the substance of the letter denying Plaintiff's request for a loan modification.

1692e(10). Specifically, the letter's representation to Plaintiff that SLS would not "initiate or continue with foreclosure during the independent review process" was deceptive and misleading in that SLS clearly had no intention of adhering to the representation as evidenced by its motion to reschedule the foreclosure sale filed in state court eight (8) days later. The representation provided Plaintiff with a false sense of security that her loan modification denial would be revisited without fear of debt acceleration during that time. The representation also placed SLS in a predatory position to ambush Plaintiff with a motion to reschedule the foreclosure sale prior to the review deadline, making payment on (or settlement of) the debt more likely.[4]

13.     Plaintiff suffered direct damages as a result of SLS's violation.

14.     The Court concludes that Plaintiff failed to meet her burden of proving that SLS violated any other provision of the FDCPA, or in any other way.

**Mootness**

15.     SLS argues that the Court find in its favor with respect to its seventh affirmative defense. SLS's seventh affirmative defense states that:

> Plaintiff's claims [Counts III through V] are moot because she was offered a modification of her loan prior to the inception of this lawsuit, which would have made her whole to the extent she was damaged in any way (which SLS expressly denies).

(Doc. 71 at 8.)

---

[4] SLS's actions in this regard also intentionally and prematurely forced Plaintiff out of RESPA's "loss mitigation" phase and into the more creditor-friendly "error resolution" phase of RESPA, thereby creating further strain on Plaintiff to pay or settle.

16.     The Court rejects SLS's seventh affirmative defense.  First, SLS brought forth no evidence at trial showing that Plaintiff was offered a loan modification prior to the inception of this lawsuit.  Indeed, the action giving rise to Plaintiff's claims commenced on January 11, 2016.  The 2015 Modification Offer was denied.  A second loan modification was offered on January 19, 2016, after the lawsuit commenced.  SLS recognizes as much but argues that Plaintiff's additional claims (Counts III through V) are moot because she ultimately entered into a loan modification prior to filing her Second Amended Complaint.  However, SLS failed to cite persuasive legal authority in support of its position.  Moreover, SLS's argument "ignores the fact that a notice of error triggers present RESPA obligations with respect to past error."  *Renfroe v. Nationstar Mort. LLC*, 822 F.3d 1241, 1246 (11th Cir. 2016).  The Court concludes that Plaintiff's claims were not rendered moot.

**Plaintiff's Notices of Error Were "Qualified Written Requests"**

17.     SLS next argues that Plaintiff's May 20, 2016, November 28, 2016, January 17, 2017, and March 1, 2017 notices of error are not "qualified written requests" under RESPA because they do not relate to servicing of a loan. Specifically, SLS contends that requests related to loss mitigation or loan modifications cannot form the basis of a valid qualified written request.  As such, SLS claims it had no duty to respond to the notices of error under RESPA.

18.     The Court disagrees.  The cases cited in support of SLS's argument are inapposite.  Further, the Court concludes that the 2010 amendments to

RESPA, implemented in 2014, broadly define servicing to include the notices of error at issue here. *See* 12 U.S.C. § 2605(e)(1)(B) (defining a qualified written request as written correspondence that enables the servicer to identify the borrower and includes a statement of the reasons the borrower believes that the account is in error); 12 U.S.C. § 2605(i)(3) (defining servicing as "receiving any scheduled periodic payments from a borrower pursuant to the terms of any loan . . . and making the payments of principal and interest and such other payments with respect to the amounts received from the borrower as may be required pursuant to the terms of the loan"); 12 U.S.C. § 2605(k)(1)(C) (stating that a servicer of a federal regulated mortgage shall not "fail to take timely action to respond to a borrower's requests to correct errors relating to allocation of payments, final balances for purposes of paying off the loan, or *avoiding foreclosure*, or other standard servicer's duties") (emphasis added); *see also Nunez v. J.P. Morgan Chase Bank, N.A.* 648 F. App'x 905, 907 (11th Cir. 2016) (recognizing that a RESPA error resolution claim could arise from notices of errors related to the implementation of a loan modification and noting that "[a]ccount errors are broadly defined by [12 C.F.R.] § 1024.35(b), which includes a residual category for [a]ny other error relating to the servicing of a borrower's mortgage loan.'") (quoting 12 C.F.R. § 1024.35(b)(11)). Thus, Plaintiff's notices of error constitute qualified written responses under RESPA.

**Count III (RESPA – Error Resolution Procedures)**

19.     The goal of RESPA is "transparency and facilitation of communication." *Bates v. JPMorgan Chase Bank, NA*, 768 F.3d 1126, 1135 (11th Cir. 2014).  To achieve its goal, RESPA requires that when a servicer receives a qualified notice of error, absent exceptions inapplicable here, it "must either correct the errors the borrower identified and notify the borrower in writing or, after a reasonable investigation, notify the borrower in writing that it has determined no error occurred and explain the basis for its decision." *Lage v. Ocwen Loan Servicing LLC*, 839 F.3d 1003, 1007 (11th Cir. 2016) (citing 12 C.F.R. § 1025.35(e)(1)(i)); *see also* 12 C.F.R. § 2605(e)(2).  The Court concludes that SLS failed to provide "transparency and facilitation of communication" and thereby violated RESPA's error resolution procedures.

20.     As an initial matter, it is difficult for the Court (let alone Plaintiff) to decipher the error resolution option chosen by SLS.  For example, SLS's June 20, 2016 response to the first notice of error states that SLS researched Plaintiff's account and determined that "no error occurred" with respect to the 2015 Modification Offer, making it seem as though it chose the second error resolution option (by conducting a reasonable investigation and notifying the borrower in writing that it determined no error occurred and explain the basis for its decision).  (Ex. 29.)  Yet, the only explanation for the decision references the response to the CFPB complaint, which offered "as a courtesy" the January 19, 2016 loan modification offer, which could be interpreted as an attempt by SLS to

choose the first option (by correcting the errors the borrower identified and notifying the borrower in writing). (Ex. 29.) Similarly, SLS's December 16, 2016 response to the second notice of error states that the *April 2015* modification efforts could not be completed because SLS "did not receive signed final modification documents," but also states that it offered Plaintiff a new loan modification offer with respect to the *November 2015* modification efforts. (Ex. 3.)

21.     Nevertheless, the intentionally vague and contradictory statements (as well as a lack of specific explanation for SLS's denial of the 2015 Modification Offer) lack the transparency required to meet RESPA's error resolution obligations. The Court concludes that Ms. Ollier's testimony that SLS denied the 2015 Modification Offer solely because Plaintiff failed to submit two "wet-ink" originals of the 2015 Modification Offer, and that SLS made the reason for that denial clear in written correspondence, lacks credibility. Ms. Ollier's testimony is belied by the written correspondence sent by RESPA.

22.     The December 14, 2015 denial letter left intentionally vague the reason for denial and did not mention the failure by Plaintiff to submit two "wet-ink" originals.[5] (Ex. 1.)

23.     The January 19, 2016 response to the CFPB complaint was likewise left intentionally vague. Indeed, the correspondence did not explain why SLS

_____

[5] It is unclear why the denial letter referenced the original October 31, 2015 deadline when that was extended by SLS.

believed that no error occurred. The letter states as a matter of fact that Plaintiff's loan modification documents were received after the October 31, 2015 deadline (a deadline that was extended by SLS). (Ex. 29.) The letter also explains that SLS "as a courtesy" has elected to reopen the loss mitigation process and, contrary to Ms. Ollier's testimony, would send an updated agreement "[a]s [Plaintiff] has not submitted *a wet-ink copy* of the previous modification." (*Id.* (emphasis added).)

24. The June 20, 2016 response to Plaintiff's first notice of error also failed to explain why SLS denied Plaintiff's 2015 Modification Offer. The response merely referenced the January 19, 2016 response, which also failed to explain why SLS denied the 2015 Modification Offer. (Ex. 2.)

25. SLS's December 15, 2016 response to the second notice of error likewise failed to explain the reason for the initial denial in a transparent manner. The response only stated that SLS "w[as] unable to finalize the modification as [it] did not receive signed final modification documents." (Ex. 3.)

26. SLS's February 9, 2017 response to Plaintiff's third notice of error not only failed to explain the reason for the denial of the 2015 Modification Offer in a transparent manner, it contradicted Ms. Ollier's trial testimony. According to the February 9, 2017 response, "it [wa]s *uncertain* whether the correspondence received by "SLS" was the 'wet-ink' signed modification offer." (Ex. 26.) In vague and contradictory fashion, SLS stated that it could not complete the 2015 Modification Offer because "of the fact that that the documents were received

after the October 31, 2015 deadline, coupled with the fact that [Plaintiff] was not in contact with SLS."[6]  (*Id.*)

27.     Finally, SLS's April 11, 2017 response to Plaintiff's fourth notice of error reiterated its February 9, 2017 response and referred Plaintiff to the March 7, 2017 loan modification offer.  (Ex. 5.)  The Court concludes that SLS never provided Plaintiff a transparent and noncontradictory explanation as to the basis of its decision that "no error occurred" with respect to its denial of the 2015 Modification Offer.  The Court also concludes that SLS's RESPA correspondence never explained that SLS denied the 2015 Modification Offer solely because Plaintiff failed to submit two "wet-ink" originals of the 2015 Modification Offer. The vague and contradictory nature of SLS's RESPA correspondence failed to meet RESPA's goal of "transparency and facilitation of communication," thereby violating RESPA's error resolution procedures.  *Cf. Nunez*, 648 F. App'x at 909-10 (reversing dismissal of RESPA claim where servicer's responses to notice of error contradicted the history of the loan, failed to acknowledge its error, and were "unreasonable assessments of the situation").

28.     The Court concludes that this case is distinguishable from the cases cited by SLS where a borrower is simply unsatisfied with the explanation supplied by the servicer.  Here, SLS's vague and contradictory statements never

---

[6] It is again unclear why SLS used the original deadline of October 31, 2015 when that deadline was extended by SLS.

amounted to a transparent and decipherable explanation of the decision to deny the 2015 Modification Offer.

29.    Because of this conclusion, SLS's argument that Plaintiff's notices of error were merely duplicative is without merit.

30.    The Court also concludes that SLS failed to perform a reasonable investigation upon receipt of the notices of error.  If SLS had performed such an investigation, it would have discontinued utilizing the October 31, 2015 deadline in its responses and would have provided a transparent and consistent explanation for why the 2015 Modification Offer was denied.

31.    Plaintiff suffered actual damages because of SLS's violation of RESPA's error resolution procedures.

## Count IV (Negligence Per Se)

32.    Because Count IV is entirely premised on SLS being liable under Count III for having violated RESPA and 12 C.F.R. § 1024.35, the Court concludes that SLS is liable as to Count IV for the same reasons discussed above.  *See Nunez v. J.P. Morgan Chase Bank, N.A*., No. 6:14-cv-1485-Orl-31GJK, 2017 WL 1552049, at *9 (M.D. Fla. May 1, 2017) ("Nunez's negligence per se claim is dependent on a finding that Chase breached the duties imposed on it by RESPA.").

33.    While the Court concludes that Plaintiff suffered actual damages relating to Count IV, the Court concludes that Plaintiff did not make the requisite

showing for "gross negligence" or punitive damages under Florida Statute Section 768.72.

## Count V (FCCPA)

34.     Plaintiff claims that SLS violated the Florida Consumer Collection Practices Act, Florida Statutes Section 559.72(9) by the "continued maintenance of the foreclosure action" after the Plaintiff allegedly modified her loan in November 2015.  The Court disagrees.

35.     To recover under this claim, Plaintiff had the burden of proving that SLS had actual knowledge that it was bound by the 2015 Modification Offer. *Finster*, 245 F. Supp. 3d at 1318.  The Court concludes that Plaintiff failed to present sufficient evidence at trial to meet her burden of proving that SLS knew they were bound by the modification agreement.  Thus, Count V fails.

## Remaining Affirmative Defenses

36.     The Court has disposed of SLS's first, third through fifth, and seventh affirmative defenses by the foregoing conclusions of law.  With respect to SLS's second affirmative defense, the Court concludes that it failed to present evidence at trial sufficient to show that Plaintiff's claims should be barred by failing to satisfy a necessary condition precedent by not providing SLS with a notice and cure provision of the mortgage.  Moreover, Plaintiff did not bring any contractual claim against SLS and, in any event, RESPA expressly preempts any inconsistent state contract law.  *See* 12 U.S.C. § 2616.  Notably, SLS is not a party to the mortgage.

37.     SLS asserts in its sixth affirmative defense that Plaintiff failed to mitigate damages by "refusing to subsequently modify her loan in the period immediately following her failure to submit the requisite information in November 2015." (Doc. 71 at 8.)  The Court disagrees.  As previously discussed, the January 19, 2016 loan modification contained different terms than the 2015 Modification Offer.  The Court concludes that Plaintiff was not required to mitigate her damages by entering into a different loan modification than that offered initially.  Plaintiff did enter into the March 2017 loan modification offer when SLS finally presented an offer comparable to the 2015 Modification Offer.

### Damages

38.     The Court concludes that Plaintiff is entitled to recover statutory damages under the FDCPA for the intentional misleading and deceptive representation contained within the December 14, 2015 denial letter.  In determining the appropriate amount to be awarded, the Court considers "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, and the extent to which such noncompliance was intentional."  15 U.S.C. § 1692k(b)(1).  Upon consideration of the factors, the Court deems it appropriate to award Plaintiff a total amount of $500.00 in statutory damages under the FDCPA.

39.     The Court also concludes that Plaintiff suffered actual damages as a result of SLS's RESPA violations.  Because of SLS's failure to adhere to the loss mitigation review process, SLS assessed certain delinquency and attorneys' fees

against Plaintiff. Those fees count as actual damages pursuant to the Eleventh Circuit's holding in *Renfroe*, 822 F.3d at 1246. There is a causal link between SLS not conducting a second independent review of its denial of the 2015 Modification Offer and the fees assessed. However, those fees were removed from Plaintiff's account when Plaintiff subsequently entered into the modification agreement and, therefore, no fees may be assessed against SLS.

40. Because SLS failed to conduct a reasonable investigation and failed to respond to the notices of error in a transparent manner, Plaintiff suffered direct and actual damages in the amount of $8.55 related to the postage required to send the fourth notice of error. Thus, the Court awards Plaintiff $8.55.

41. The Court also finds credible Plaintiff's testimony that she suffered emotional distress as a direct result of the RESPA violations. The Court finds it appropriate to award Plaintiff $1,500.00 in emotional distress damages.[7]

42. The concludes that a total award of $2,008.55 is appropriate.

### THE COURT'S DECISION

Plaintiff has satisfied her burden of proof that SLS breached its obligations under Counts I through IV of the Second Amended Complaint. Plaintiff did not satisfy her burden of proving SLS breached its obligations under Count V. As a result, the Clerk is directed to enter judgment in favor of Plaintiff on Counts I

---

[7] The Court rejects SLS's argument that Plaintiff's testimony only related to damages she suffered in learning that the 2015 Modification Offer was denied. Such an interpretation fails to consider the full context of Plaintiff's testimony.

through IV in the amount of $2,008.55. The Clerk is also directed to terminate any pending motions and close the case. Plaintiff may file a properly supported motion for attorneys' fees and/or costs in accordance with Federal Rule of Civil Procedure 54.

       **DONE AND ORDERED** at Jacksonville, Florida, on September 17, 2018.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record